KAISER FOUNDATION HEALTH PLAN, INC., Appellant–Appellant, v. **DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, UNEMPLOYMENT INSURANCE DIVISION; DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS, EMPLOYMENT APPEALS REFEREE'S OFFICE; DIRECTOR OF LABOR AND INDUSTRIAL RELATIONS**, Appellees–Appellees

NO. 12637

(CIV. NO. 87–0060)

OCTOBER 6, 1988

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

This is a review of an administrative appeal in which Appellant Kaiser Foundation Health Plan, Inc. (Taxpayer) seeks reimbursement of accumulated unemployment insurance payments made to the state's unemployment compensation fund during January 1, 1971 through December 31, 1982. Taxpayer appeals the First Circuit Court's November 19, 1987 Decision and Order Affirming Referee's Decision entered in favor of Appellees Department of Labor and Industrial Relations, Unemployment Insurance Division (UID), Department of Labor and Industrial Relations, Employment Security Appeal Referee's Office, and the Director of Labor and Industrial Relations (collectively DLIR). The circuit court affirmed the administrative referee's decision denying Taxpayer's two applications seeking self–financing status under the Hawaii Employment Security Law, HRS ch. 383. We affirm.

**74**

I.

## STATUTORY FRAMEWORK

We begin with an overview of the pertinent federal and Hawaii statutes.

The Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301–3311 (I.R.C. §§ 3301–3311), imposes a federal unemployment tax on employers. At the same time, FUTA allows states to provide and administer federally approved unemployment compensation funds for the same purpose under state law. *Id.* Furthermore, FUTA permits tax credits of up to ninety percent of the federal tax for contributions made by employers to the state fund. I.R.C. § 3302.

Non–profit organizations, subject to limited exceptions, are exempt from federal unemployment taxation. I.R.C. § 501. In 1970, FUTA was amended (effective date January 1, 1972) to require states to include non–profit organizations in their unemployment compensation systems. This amendment allowed states to provide § 501(c)(3) organizations the option of participating in an experience–rated fund or to elect reimbursement financing (self–financing) in lieu of contributions.[1] I.R.C. § 3303(e) and (f). Simply put, rather than paying unemployment insurance based upon past experience, § 501(c)(3) organizations could now elect to reimburse the unemployment insurance fund the exact amount withdrawn and paid to the organization's employees as unemployment benefits.

In response to the 1970 federal amendment, the Hawaii state legislature, in 1971, enacted a "transition statute," HRS § 383–62(f),[2] Act 187,

---

[1] Under the 1970 federal amendment, § 501(c)(3) organizations were required to elect reimbursement financing before April 1, 1972.

[2] HRS § 383–62(f) (1976) provided (emphasis added):

(f) Notwithstanding any provisions in subsections (c) and (d), any non–profit organization that prior to January 1, 1969 paid contributions required by this part, and that pursuant to subsection (c) of this section elects within thirty days after the effective date of such subsection (c) to make payments in lieu of contributions, shall not be required, beginning with the

§ 7, 1971 Haw. Sess. Laws 394, 407, to facilitate the orderly transition to the self–financing alternative system. Pursuant to HRS § 383–62(f), § 501(c)(3) organizations that elected self–financing were also permitted to use their positive reserve balance[3] for the payment of future unemployment benefit claims. Only when the reserve balance is depleted would the organization then be required to make payments under the self–financing method.[4]

In 1977, HRS § 383–62(f) was repealed. Act 148, § 6, 1977 Haw. Sess. Laws 284, 300.

Finally, HRS § 383–62(d)(1)(D) and (E) (1985) provide (emphasis added):

(d) Benefits paid to employees of nonprofit organizations shall be financed in accordance with the provisions of this subsection. For the purpose of this subsection, a nonprofit organization is an organization (or groups of organizations) described

---

effective date of subsection (c), to make any such payments on account of any regular or extended benefits paid, on the basis of wages paid by such organization, to individuals for weeks of unemployment which begin on or after the effective date of such election *until the total amount of such benefits equals the amount of the positive reserve balance in the account of such organization.*

Pursuant to this provision, § 501(c)(3) organizations were required to make an election by January 31, 1972. *Id.*

[3] Positive reserve balance is the amount by which the organization's contributions to the unemployment insurance fund *prior* to the date of its election for self–financing *exceeded* the amount of unemployment benefits paid to the organization's employees.

*Example.* Employer X has paid a total of $1,000 in past contributions to the state unemployment insurance fund based on the experience–rated method. Employer X's employees, in turn, have received a total of $500 in unemployment benefits. Employer X has a positive reserve balance of $500.

[4] Once Employer X converts to self–financing, X would then have to pay to the unemployment fund an equal amount paid out in unemployment benefits to X's employees. Employer X, however, would first be entitled to use his $500 reserve balance as payment to the insurance fund. Only when the $500 is depleted would Employer X then be required to make payments, i.e., self–financing.

in section 501(c)(3) of the United States Internal Revenue Code which is exempt from income tax under section 501(a) of such code.

 (1) Liability for contributions and election of reimbursement. Any nonprofit organization which is, or becomes, subject to this chapter on or after January 1, 1972, shall pay contributions under the provisions of this part (with the exception of the provisions in subsection (b) of this section) applicable to other employers unless it elects, in accordance with this paragraph, to pay to the director of labor and industrial relations for the fund an amount equal to the amount of regular benefits and of one–half of the extended benefits paid, that is attributable to service in the employ of such nonprofit organization, to individuals for weeks of unemployment which begin during the effective period of such election.

. . . .

 (D) Any nonprofit organization which has been paying contributions under this chapter for a period subsequent to January 1, 1972, may change to a reimbursable basis by filing with the department not later than thirty days prior to the beginning of any calendar year a written notice of election to become liable for payments in lieu of contributions. Such election shall not be terminable by the organization for that and the next calendar year.

 (E) The department *may for good cause extend the period within which a notice of election*, or a notice of termination, *must be filed* and *may permit an election to be retroactive* but not any earlier than with respect to benefits paid after December 31, 1971.

## II.

## FACTUAL BACKGROUND

On March 11, 1955, Taxpayer was incorporated as a non–profit organization. Taxpayer subsequently applied for non–profit tax status pursuant to I.R.C. § 501 but did not specify whether it sought status under I.R.C. § 501(c)(3) or 501(c)(4). In 1963, the federal Internal Revenue Service (IRS) granted Taxpayer § 501(c)(4) status retroactive to its incorporation in 1955.[5] Taxpayer did not challenge its § 501(c)(4) designation.

In 1971, the Hawaii state legislature enacted the transition statute. In 1971, after the transition statute was enacted, Taxpayer's provider entity, Kaiser Foundation Hospital (Hospital), applied for and was granted self–financing status. Taxpayer was aware of the transition statute in 1971.[6]

In 1976, another health maintenance organization (individually HMO, collectively HMOs), the Georgetown Health Plan (Georgetown), unsuccessfully applied for § 501(c)(3) status. Georgetown then reapplied for § 501(c)(4) status, which the IRS granted. Soon thereafter, Georgetown reapplied for § 501(c)(3) status but that application was not acted upon by the IRS.[7]

In 1977, the transition statute was repealed by Act 148, Session Laws of Hawaii, 1977.

In 1981, Taxpayer merged with Georgetown. In August 1981, Taxpayer heard rumors that the IRS would begin to rule favorably upon

---

[5]Prior to 1963, Taxpayer held no tax status.

[6]Taxpayer and Hospital have a common board of directors and management in the Hawaii region. Transcript of March 8, 1983 at 51, 68. Taxpayer's controller was also the same controller for Hospital. *Id.* at 69–70. Taxpayer acknowledges that Hospital is closely affiliated and shares management with Taxpayer. Opening Brief at 20.

[7]Prior to 1981, no other HMOs had been granted § 501(c)(3) status. Beginning in 1973, however, many new HMOs had simultaneously applied for both § 501(c)(3) and § 501(c)(4) status. While the IRS granted § 501(c)(4) status in these cases, the IRS did not rule on the § 501(c)(3) status. Taxpayer was aware of these pending applications.

§ 501(c)(3) applications from similar HMOs. Later during the same month, Taxpayer learned that the IRS had officially taken action to exempt another HMO as a § 501(c)(3) organization and had also begun to act favorably on the backlog of § 501(c)(3) applications on file. Taxpayer then proceeded to compile the necessary documents and on·September 15, 1981, filed an application for § 501(c)(3) status with the IRS.[8]

An IRS letter dated December 10, 1981, was received by Taxpayer on December 21, 1981. The letter stated that Taxpayer was granted § 501(c)(3) status. Because no effective date was contained in the IRS letter, by letter dated December 29, 1981, Taxpayer requested clarification on whether its § 501(c)(3) status was retroactive to its date of incorporation. An IRS response letter dated January 26, 1982, and received by Taxpayer on February 1, 1982, stated that the IRS deemed Taxpayer's § 501(c)(3) status to be retroactive to March 11, 1955, the date of its incorporation.[9]

With this newly recognized § 501(c)(3) status, Taxpayer was now able to elect reimbursement financing (self–financing) in lieu of contributions pursuant to HRS § 383–62(d)(1)(D). The deadline for electing self–financing rather than contributions for the calendar year 1982 was December 1, 1981.[10]

On July 12, 1982, Taxpayer submitted two applications for self–financing status to the UID, one application with the proposed effective

---

[8] Taxpayer's controller for the Hawaii region (who also held the same position with Hospital) indicated that Taxpayer did not apply for § 501(c)(3) status prior to September 1981 because there was no point in filling out the voluminous documents when the IRS was sitting on a backlog of § 501(c)(3) applications from HMOs similar to Taxpayer. Transcript of March 8, 1983 at 53.

[9] The IRS response letter, however, did not state why or for what purpose the IRS had granted retroactive status to Taxpayer.

[10] Although HRS § 383–62(d)(1)(D) sets a time requirement for filing a written notice of election, this requirement is not absolute. Pursuant to HRS § 383–62(d)(1)(E), the time period for filing may be extended for "good cause." Also, the DLIR may permit an election for self–financing status to be retroactive to January 1, 1972.

date of January 1, 1972,[11] the other application with the proposed effective date of January 1, 1982. By letter dated August 10, 1982, the UID denied both applications on the grounds that Taxpayer failed to timely file a written notice of election as to becoming a self–financing employer (citing HRS § 383–62(d)(1)(D)). On August 24, 1982, Taxpayer submitted to the UID a timely notice of appeal and a request for hearing on the denial.

On January 6, 1983 and on March 8, 1983, hearings were held before the administrative referee (Referee Robert S. Page).[12]

On December 12, 1986, the referee issued a Decision affirming the UID's denial of Taxpayer's two applications for self–financing. *In re Kaiser Found. Health Plan, Inc.*, Referee's Decision No. 1079–82A (December 12, 1986).[13]

On January 9, 1987, Kaiser filed a timely notice of appeal to the circuit court. On September 14, 1987, a hearing on Taxpayer's appeal before the circuit court was held. On November 19, 1987, the circuit court entered a Decision and Order Affirming [the] Referee's Decision.

---

[11] Due to the IRS' ruling that Taxpayer's § 501(c)(3) status was retroactive to its date of incorporation, March 11, 1955, Taxpayer's application seeking the effective date of January 1, 1972 was submitted pursuant to the retroactive provision of HRS § 383–62(d)(1)(E).

[12] During the March 8, 1983 hearing, Taxpayer attempted to introduce into evidence Exhibit V, consisting of documents relating to the treatment of a similar case by the Ohio Bureau of Employment Services involving the Kaiser Foundation Health Plan of Chicago. Transcript of March 8, 1983 at 21–22. DLIR objected to the exhibit on the grounds that it was irrelevant, argumentative and prejudicial. *Id.* at 34–35. Noting that the holdings or findings of another administrative agency in another jurisdiction were not binding, the referee declined to consider the exhibit. *Id.* at 36–37.

We find no merit in Taxpayer's contention that the referee abused his discretion in excluding Exhibit V. *See* HRS § 91–10(1) (1985).

[13] Following a statement of the facts, Record at 49–50, the referee cited HRS § 383–62(d)(1)(D) and (E) as the basis for his decision. *Id.* at 51. The referee also concluded that Taxpayer's desire for retroactive status lacked sufficient grounds. *Id.*

Upon a thorough review of the record, we find no clear error in the referee's factual findings.

Following a statement of the facts,[14] the circuit court concluded:

1. Taxpayer cannot avail itself of former § 383–62(f) since the statute was repealed prior to [Taxpayer's] 501(c)(3) status. Thus, [Taxpayer's] July 1982 election may not be retroactive to 1972.

2. Taxpayer did not show "good cause" to extend the notice of election period back to January 1, 1982 when it took [T]axpayer from February 1, 1982 to July 12, 1982 to make the election that was due no later than early December 1981. The only cause shown for the delay is the late determination by IRS of [T]axpayer's change in status, yet IRS made its position known in December 1981. Taxpayer could have filed it [sic] selection and/or asked for an extension long before July 1982.

3. The referee's rejection in toto of [T]axpayer's position appears to be based on the foregoing conclusions 1 and 2 and his decision is not clearly erroneous or otherwise defective under § 91–14(g), H.R.S.

Record at 383.

Upon the circuit court's dismissal of Taxpayer's appeal, this appeal followed.

III.

**STANDARD OF REVIEW**

Our starting point is the standard of review applicable to this administrative appeal. On secondary judicial review of an administrative decision, Hawaii appellate courts apply the same standard of review as that applied upon primary review by the circuit court. *IBEW, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 713 P.2d 943 (1986); *Kilauea Neighborhood Ass'n v. Land Use Comm'n*, 7 Haw. App. ___, 751 P.2d 1031 (1988). The applicable standards of review are provided in HRS

---

[14] We find no clear error in the circuit court's factual findings. Record at 380–83. In large part, the circuit court's Findings of Fact recite the administrative referee's factual findings.

§ 91–14(g) (1985). Under HRS § 91–14(g)(5), an administrative agency's factual findings are presumptively correct, and cannot be set aside on appeal unless they are shown to be clearly erroneous in view of the reliable, probative and substantial evidence on the whole record. *Dedman v. Board of Land & Natural Resources*, 69 Haw. ___, 740 P.2d 28 (1987), *cert. denied,* ___ U.S. ___, 108 S. Ct. 1573, 99 L. Ed. 2d 888 (1988); *Agsalud v. Lee*, 66 Haw. 425, 664 P.2d 734 (1983) (per curiam). However, the "clearly erroneous" standard of review is only applicable to an agency's factual findings and is not applicable to conclusions of law. *Camara v. Agsalud*, 67 Haw. 212, 685 P.2d 794 (1984). In contrast, an agency's legal conclusions are freely reviewable upon judicial review. *IBEW, Local 1357 v. Hawaiian Tel. Co.*, 68 Haw. 316, 713 P.2d 943 (1986); *see also* HRS § 91–14(g)(4) (1985). And discretionary determinations are reviewable for abuse. *See* HRS § 91–14(g)(6).

IV.

DISCUSSION

Taxpayer seeks to recoup its excess reserve balance of unemployment taxes assessed against Taxpayer from January 1, 1971 through January 31, 1982. Taxpayer asserts three supporting theories. These theories, in turn, involve the application of several provisions of the Hawaii Employment Security Law (HESL), HRS ch. 383: HRS § 383–62(d)(1)(D) and (E), § 383–62(f) (repealed in 1977) and § 383–76. We now examine Taxpayer's theories.

A.

JULY 1982 APPLICATION FOR SELF–FINANCING WITH THE PROPOSED EFFECTIVE DATE OF JANUARY 1, 1982

On July 12, 1982, Taxpayer submitted two applications for self–financing to the UID, one application with the proposed effective date of January 1, 1982. By letter dated August 10, 1982, the UID denied both applications based on Taxpayer's failure to timely file a written notice of election pursuant to HRS § 383–62(d)(1)(D). On December 12, 1986, the

administrative referee affirmed the UID's denial of Taxpayer's two applications for self-financing, citing HRS § 383–62(d)(1)(D) and (E). On judicial review, the circuit court affirmed the referee's decision.

The "good cause" language in HRS § 383–62(d)(1)(E) is preceded by the terms "[t]he *department may* . . . ." Clearly, the determination of good cause is within the DLIR's discretion. Upon judicial review of an agency's decision before this court, the agency's discretionary determination will not be reversed in the absence of abuse. *See* HRS § 91–14(g)(6). We apply this standard to the referee's decision that in the absence of good cause, Taxpayer's application for self-financing with the proposed effective date of January 1, 1982 was not timely submitted.

Taxpayer maintains that good cause existed to extend the period upon which Taxpayer's notice of election for self-financing, effective January 1, 1982, could be filed. But for the unusual treatment by the IRS, namely the timing of the IRS' initial notification (received by Taxpayer on December 21, 1981) that Taxpayer's request for § 501(c)(3) status was approved, Taxpayer asserts that its lack of § 501(c)(3) status to apply for self-financing until receipt of the IRS' confirmation of retroactive § 501(c)(3) status on February 1, 1982 constituted good cause. We disagree.

The fundamental starting point for interpreting a statute is the language of the statute itself. *State v. Moniz*, 69 Haw. ___, 742 P.2d 373 (1987). Where the statute's language is plain and unambiguous, the court's only duty is to give effect to its plain and obvious meaning. *Hubbell v. Iseke*, 6 Haw. App. 485, 727 P.2d 1131 (1986).

The deadline for filing the self-financing application commencing with the calendar year 1982 was December 1, 1981. While Taxpayer was not formally notified of its § 501(c)(3) status by the IRS until December 21, 1981, the Taxpayer has failed to explain why it then waited until July 12, 1982 to file its self-financing application. No good cause having been shown for the delay, there was no abuse of discretion on the part of the UID in concluding that the application was not timely submitted. The UID's determination was therefore validly upheld by the referee.

We hold that Taxpayer's delay in filing its self-financing application (effective January 1, 1982) from December 21, 1981 to July 12, 1982 did not constitute "good cause."

B.

## JULY 1982 APPLICATION FOR SELF–FINANCING WITH THE PROPOSED EFFECTIVE DATE OF JANUARY 1, 1972

Taxpayer's second theory is based on its second application for self–financing submitted to the UID, with the effective date of January 1, 1972.

Taxpayer's theory is as follows. By virtue of its retroactive § 501(c)(3) status back to the date of Taxpayer's incorporation, March 11, 1955, Taxpayer seeks approval of its self–financing application (effective January 1, 1972) under good cause. Once approved, Taxpayer's self–financing status would be retroactive to January 1, 1972, thereby "triggering" application of the transition statute. The transition statute, in turn, would enable Taxpayer to use its existing positive reserve balance as of January 1, 1972 for the payment of any future unemployment claims. Moving forward in time, only when the entire reserve balance is depleted would Taxpayer then be required to make any reimbursable payments to the unemployment tax fund in lieu of contributions, pursuant to HRS § 383–62(d). We reject Taxpayer's "chain" theory.

The *foundation* of Taxpayer's theory that it is entitled to go back in time to recoup excess contributions payed to the unemployment insurance fund is the *transition statute*. However, the transition statute was repealed in 1977. Taxpayer did not file its second application for self–financing (effective January 1, 1972) until July 12, 1982. At that point, the transition statute pursuant to which Taxpayer sought recoupment was no longer in existence. Taxpayer, therefore, cannot avail itself of former HRS § 383–62(f).

Taxpayer contends that Act 148, Session Laws of Hawaii, 1977, merely "deleted" the transition statute for housekeeping purposes. We disagree. In the absence of clear legislative intent to the contrary, repeal means the statute or statutory provision no longer exists. *See* HRS § 1–7 (1985), HRS § 1–9 (1985); *see also Hamano v. Miyake*, 24 Haw. 12 (1917).

Additionally, we note that during the period the transition statute was in existence, Taxpayer never applied for § 501(c)(3) status with the IRS even though it was aware of HRS § 383–62(f) in 1971. Instead, Tax-

payer never formally applied for § 501(c)(3) status until September 15, 1981. By this time, the transition statute was repealed.

Finally, "good cause" was also not shown for Taxpayer's five month delay from February 1, 1982, the date Taxpayer formally received confirmation of its retroactive § 501(c)(3) status, to July 12, 1982, the date Taxpayer submitted its second application for self–financing.

We hold that Taxpayer's retroactive § 501(c)(3) status does not permit Taxpayer to avail itself of former HRS § 383–62(f). The circuit court's conclusion is not in error.

## C.

### HRS § 383–76 (1985)

We find no merit in Taxpayer's assertion that it is entitled to a refund of contributions, less benefits paid, for the amounts by which its contributions exceeded benefits "erroneously" paid to the unemployment insurance fund for the calendar years 1979 through 1982. *See* HRS § 383–76 (1985). Taxpayer contends that the erroneous payments resulted from its failure to recognize that it was entitled to § 501(c)(3) treatment during the 1979—1982 period.

We hold that Taxpayer's payments during the 1979—1982 period were not in error. Rather, such payments to the unemployment tax fund were made in accordance with HRS ch. 383, HESL.

## V.

### CONCLUSION

The circuit court's Decision and Order Affirming [the] Referee's Decision is hereby affirmed.

Affirmed.

*Roland Q. F. Thom* (*Dean Y. Sugano* with him on the briefs; Char, Hamilton, Campbell & Thom, of counsel) for Appellant.

*Wilfredo Tungol* (*Wayne A. Matsuura* with him on the brief), Deputy Attorneys General, for Appellees.