812 P.2d 1199 (1991)
Richard YARNELL, Claimant-Appellant,
v.
CITY ROOFING, INC., and Industrial Indemnity Company, Employer, Insurance Carrier-Appellees, and
Special Compensation Fund, Appellee.
No. 14400.
Intermediate Court of Appeals of Hawaii.
April 18, 1991.
*1201 Jeffrey M. Taylor, Honolulu, for claimant-appellant.
Susan Y.M. Chock (Leroy T. Kuwasaki, Jr., on the brief, Law Office of Leroy T. Kuwasaki, Jr., of counsel), Honolulu, for employer-appellee and Ins. carrier-appellees.
Robyn M. Kuwabe, Deputy Atty. Gen. (Wayne A. Matsuura, Deputy Atty. Gen., on the brief), Dept. of Labor & Indus. Relations, Honolulu, for Special Compensation Fund.
Before BURNS, C.J., and HEEN and TANAKA, JJ.
HEEN, Judge.
Claimant-Appellant Richard Yarnell (Yarnell) appeals from the December 7, 1989 Decision and Order (Order) of the Labor and Industrial Relations Appeals Board (Appeals Board). The Order affirmed the decision of the Director (Director) of the Department of Labor and Industrial Relations (DLIR) that Yarnell was permanently and partially disabled at the level of 50% of the whole man. We vacate the Order and remand the case to the Appeals Board for further proceedings consistent with this opinion.

I.
On April 16, 1974, while employed by City Roofing, Inc. (City Roofing), Yarnell sustained a lower back injury. Four days later, City Roofing terminated Yarnell "for continued absenteeism." On April 24, 1974, Yarnell filed a claim for workers' compensation benefits. In its report of industrial injury, City Roofing denied liability for Yarnell's injury.
During the summer of 1974, three doctors examined Yarnell, two on behalf of City Roofing's insurance carrier, Industrial Indemnity Co. (Industrial). All three doctors found that Yarnell had a degenerative disc at L5-S1, and a problem with his right ankle. On August 22, 1974, following an August 13, 1974 hearing, the Director issued a decision holding City Roofing and Industrial liable for temporary total disability (TTD) in the amount of $112.50 per week from April 25, 1974.
Further medical tests in early 1975 confirmed the degenerative disc diagnosis, but the examining doctors expressed a reluctance to operate at that time, due to Yarnell's mental outlook. On April 2, 1975, Doctor George Schnack (Dr. Schnack), a psychiatrist, examined Yarnell. He concluded that "Yarnell does have a depressive reaction resultant from his back condition[.]"
In July 1975, Doctor Ralph Cloward (Dr. Cloward), a neurosurgeon, examined Yarnell and recommended surgery. In September 1975, Dr. Cloward removed the L5-S1 disc from Yarnell's back and replaced the disc with four bone grafts.
On October 4, 1975, Dr. Schnack reported that Yarnell sought his help in obtaining vocational rehabilitation. On the same date, Dr. Schnack diagnosed Yarnell as having pseudopsychopathic schizophrenia.
In early 1976 Yarnell attempted vocational rehabilitation. On January 8, 1976, Dr. Schnack reported that Yarnell was giving his counselors "a terrible time." On February 16, 1976, Dr. Cloward reported that Yarnell had enrolled in the Cannon School of Business, "but he did so poorly he was advised to go to McKinley High School and *1202 take a refresher course. [Yarnell] decided this was too much for him[.]"
On March 30, 1976, Dr. Cloward released Yarnell from his care and gave him a back-to-work slip effective April 1, 1976. Two days later, Dr. Schnack reported that Yarnell was getting worse from a psychiatric standpoint. He wrote that Yarnell was "very upset over Dr. Cloward's insistence he should return to work, and confused over what to do about vocational rehabilitation." Shortly thereafter, on April 17, 1976, Dr. Schnack wrote that "it is now my considered opinion that ... Yarnell is a Borderline Schizophrenic[,]" and that "Yarnell episodically has secondary psychotic symptoms, such as hallucinated voices, depersonalization, and possible paranoid and somatic delusions."
On November 29, 1976, Industrial unilaterally terminated Yarnell's TTD. However, at a hearing before the Disability Compensation Division (DCD) of the DLIR on June 21, 1977, Industrial agreed to restore Yarnell's TTD, retroactive to November 30, 1976. The Director issued an order to this effect on November 1, 1977, and Industrial appealed the order.
On August 30, 1977, Yarnell underwent a myelogram at Hawthorne Community Hospital in Hawthorne, California. Doctor Milton Avol (Dr. Avol) performed the test, which "revealed evidence of a large midline disc herniation at the L-4, 5 level." On November 7, 1978, Dr. Avol operated on Yarnell, performing a laminectomy and foraminotomy at L4-5 and L5-S1.
The Appeals Board heard Industrial's appeal of the November 1, 1977 order on January 21 and April 1, 1981. On September 11, 1981, the Appeals Board issued a Decision and Order which concluded that Yarnell was temporarily and totally disabled from April 25, 1974, to January 20, 1981. The Appeals Board also concluded that Yarnell sustained a permanent partial disability amounting to 25% of the whole man and 5% of the right foot, and found City Roofing liable for this disability. Although the Special Compensation Fund (Fund) was not a party to Industrial's appeal, Industrial argued that the Fund should be liable for Yarnell's benefits. However, the Fund was held not to be liable on the basis that there was insufficient evidence to establish that Yarnell suffered from a ratable permanent disability prior to his employment with City Roofing. See Hawaii Revised Statutes (HRS) § 386-33 (1985). The September 11, 1981 decision was not appealed by any party.
On September 17, 1981, Dr. Schnack wrote that,
from a psychiatric standpoint, I believe that I can say with virtually total assurance, Mr. Yarnell will never again return to work[.] ... [H]e is now psychiatrically unemployable.
Yarnell continued to have problems with his back. On June 28, 1982, he filed an Application to Reopen his workers' compensation claim, on the ground of a change in his physical condition. On July 15, 1982, the Director granted Yarnell's application, pursuant to HRS § 386-89(c) (1985). The Director scheduled a hearing for September 30, 1982. On November 8, 1982, the Director issued a decision reinstating Yarnell's TTD from October 1, 1982. The Director did not decide the issues of permanent partial disability and disfigurement.
On January 20, 1983, Yarnell was examined by Doctor Henry Dodge (Dr. Dodge), a neurosurgeon in Los Angeles, California. Dr. Dodge recommended further surgery on Yarnell's back. On March 17, 1983, he and Doctor Robert Watanabe (Dr. Watanabe) operated. Dr. Dodge performed a lumbar laminectomy with nerve root decompression, and Dr. Watanabe performed a lumbar spine fusion from L4-S1 with a bone graft. During the surgery, the doctors discovered a previously undetected fracture of Yarnell's pars interarticularis at L4-5 on the right, which they felt was causing most of Yarnell's pain, which Yarnell "[c]ertainly ... was not imagining[.]"
In April 1983, Industrial attempted to set up vocational rehabilitation for Yarnell with Professional Rehabilitation Services in Los Angeles. Yarnell rejected the services. At about the same time, Doctor Oscar Thomsen (Dr. Thomsen) of Los Angeles became Yarnell's treating psychiatrist. On *1203 December 5, 1983, Doctor Alvin Turken (Dr. Turken) of Culver City, California, became Yarnell's treating physician. After his first examination, Dr. Turken stated that Yarnell "[h]as lost at least three-quarters of his capacity for heavy work."
On January 6, 1984, Dr. Thomsen wrote:
[Yarnell's] emotional status is totally dependent upon the status of his physical condition. If the latter is not significantly improved, I would consider him permanently disabled and stationary rated at 75%.
On January 11, 1984, Dr. Watanabe released Yarnell for work, and Dr. Dodge released Yarnell for his regular occupational activities on February 6, 1984. Dr. Turken felt that Yarnell should only do light duty work.
In March 1984, Yarnell began working at the Alexander Becker Carpet Company (Becker Carpet) in Los Angeles. On March 28, 1984, Yarnell hurt his back while lifting a roll of carpet with other workers. After Yarnell took two days off to rest, Becker Carpet discharged him. Yarnell has not been employed since.
Following this incident, Yarnell's back problems continued. On June 11, 1984, and on August 8, 1984, Dr. Dodge and Dr. Watanabe, respectively, wrote that Yarnell should do only light work. Dr. Watanabe wrote that Yarnell was capable of performing modified work with the following limitations: "no lifting over 25 pounds, no climbing, no repeat lifting or bending, no running and no jumping."
Throughout 1985 and 1986, Dr. Turken noted that Yarnell's back condition remained suspect. Also, on March 19, 1986, Dr. Thomsen felt that Yarnell was "100% disabled, permanent and stationary[,]" from a psychiatric viewpoint. On September 10, 1986, Dr. Thomsen wrote:
Mr. Yarnell's severe depression, fear and mistrust arise out of his physical condition secondary to his back injury and from his belief that he has been mistreated and neglected by the insurance carriers.
On January 16, 1987, the Director issued a decision ordering Yarnell to submit himself for examination by four Independent Medical Examiners (IME): Doctors John Henrickson, Jr. (Dr. Henrickson), Donald Maruyama (Dr. Maruyama) and Robert Marvit (Dr. Marvit) in Hawaii, and Jaime Anselen (Dr. Anselen) in Los Angeles.
Dr. Henrickson found Yarnell to be impaired at 26% of the whole man, and estimated that Yarnell reached medical stability in August 1984. He concluded:
At the present time [February 15, 1987] ... I feel that he is capable of returning to light duty work, as has been noted by other examiners. I do not consider him totally disabled. I would recommend no lifting or carrying over 25 [pounds], no prolonged sitting, standing or deep bending.
Dr. Maruyama issued his report on February 18, 1987. He found a 29% impairment of the whole man, and estimated that medical stability occurred in June or July 1984. He also felt that Yarnell could do light work, and stated, "[i]n general, [Yarnell] can lift up to approximately 30 pounds, but should restrict his bending, squatting and kneeling."
Drs. Anselen and Marvit, both of whom are psychiatrists, rated Yarnell as 20% impaired from a psychiatric viewpoint.
Dr. Thomsen felt that all four of the IME reports were wrong, and at that time, Dr. Turken noted continually that Yarnell was having an inversion problem with his right ankle.
On May 14, 1987, another hearing took place before the DCD. In their respective post-hearing statements, the parties argued the applicability of the odd-lot doctrine. The Director issued a decision on August 24, 1987. The Director held that Yarnell's TTD payments must remain in place, on open order, as Yarnell's right leg and ankle problem meant his condition had not yet stabilized. Although not necessary to this decision, the Director found that Yarnell was not totally disabled for work.
On November 17, 1987, the Director ordered Yarnell to submit himself for examination by Doctor Ronald Levey (Dr. Levey) *1204 in Canoga Park, California. Dr. Levey's report, dated January 27, 1988, stated that he could not "find anything specifically abnormal with [Yarnell's] ankle, foot or right leg[.]" Dr. Turken criticized Dr. Levey's results.
On March 3, 1988, another hearing was held at the DCD, for the purposes of determining permanent disability and evaluating disfigurement. Yarnell again argued the applicability of the odd-lot doctrine.
The Director issued a decision on April 28, 1988, and an amended decision on May 16, 1988. Crediting Dr. Levey's report, the Director found that Yarnell's right leg and foot had stabilized. With stabilization, the Director found City Roofing liable for TTD from April 25, 1974, to January 20, 1981, and from October 1, 1982, to January 27, 1988. The Director also concluded that Yarnell was 50% permanently partially disabled. Yarnell was also awarded a lump sum of $1,100 for disfigurement due to scars on his back. Again, the Fund was not required to contribute to the award. Yarnell appealed these decisions to the Appeals Board.
On May 10, 1988, Dr. Turken wrote that Yarnell was not stable and was not getting any better. He later noted that Yarnell had a major spontaneous pain flare-up over the Memorial Day weekend that kept him bedridden. On June 15, 1988, Dr. Thomsen wrote that "Yarnell's stress is escalating as might be expected. He is panicked by the cutoff of funds and the directive that he must return to the comparable physical work that originally caused his injury."
On July 28, 1988, upon Industrial's motion, the Appeals Board made the Fund a party to Yarnell's appeal. On August 8, 1988, Dr. Turken was deposed. He stated that Yarnell's condition was "slowly getting worse," and that, due to his flare-ups of pain, Yarnell could not perform even sedentary work on a regular 40 hours per week basis. Dr. Turken was deposed again on September 27, 1988. His diagnosis of Yarnell at that time was:
Spinal stenosis, right L5 and S1 radiculopathy, epidural fibrosis, right ankle instability secondary to radiculopathy, recurrent right ankle sprains secondary to instability, [and] hypertrophy of spine fusion mass.
Dr. Maruyama, one of the IMEs, examined Yarnell again on November 2, 1988. His report stated that there was "objective evidence" of Dr. Turken's diagnosis.
The Appeals Board hearing took place on November 30, 1988. No testimony was taken and the matter proceeded entirely on Yarnell's records, which were stipulated into evidence.
The Appeals Board issued the Order at issue on December 7, 1989. The Order affirmed the Director's decisions in their entirety. Following a denial by the Appeals Board of Yarnell's motion to reopen the hearing, he filed this appeal.

II.
Our review of the Appeals Board's findings in the Order is governed by the clearly erroneous standard of review. Chung v. Animal Clinic, Inc., 63 Haw. 642, 636 P.2d 721 (1981). Thus, we
cannot set aside the findings of [the Appeals Board] except where there is not substantial evidence in the record to support those findings or we are left with the definite and firm conviction that a mistake has been made.
Danuser v. J.A. Thompson & Son, Inc., 3 Haw. App. 564, 566, 655 P.2d 887, 889 (1982). The Appeals Board's legal conclusions are freely reviewable. Kaiser Found. Health Plan, Inc. v. Department of Labor and Indus. Relations, 70 Haw. 72, 762 P.2d 796 (1988).

III.
Yarnell's first argument, and the only one we need to consider, is that the Appeals Board's Conclusion of Law No. 2 (Conclusion), which is really a finding of fact, that Yarnell is only permanently partially disabled as opposed to permanently totally disabled is wrong. We agree.
The Conclusion reads in pertinent part: We find that Claimant is not permanently and totally disabled. Claimant's age, background, and work experience do not *1205 combine with his physical impairment to preclude him from work in the normal labor market. Claimant has not shown that he is unable to work as a result of the April 16, 1974 injury. On the facts before us, Claimant is found to be permanently and partially disabled, and not totally disabled.
(Emphasis added.)
The Conclusion shows a fundamental misapplication of the odd-lot doctrine.
[U]nder the so-called `odd-lot doctrine' ..., where an employee receives a work related permanent partial disability which combined with other factors such as age, education, experience, etc., renders him, in fact, unable to obtain employment, he is entitled to be treated as being permanently totally disabled.... [T]he employee has the burden of establishing prima facie that he falls within the odd-lot category.
Tsuchiyama v. Kahului Trucking & Storage, Inc., 2 Haw. App. 659, 660-61, 638 P.2d 1381, 1382 (1982).
Under the odd-lot doctrine, which is accepted in virtually every jurisdiction, total disability may be found in the case of workers who, while not altogether incapacitated for work, are so handicapped that they will not be employed regularly in any well-known branch of the labor market. The essence of the test is the probable dependability with which claimant can sell his services in a competitive labor market, undistorted by such factors as business booms, sympathy of a particular employer or friends, temporary good luck, or the superhuman efforts of the claimant to rise above his crippling handicaps.
2 A. Larson, Workmen's Compensation Law, § 57.51(a), at 10-164.68, 10-164.84(18) (1989) (footnotes omitted).
The Conclusion indicates that the Appeals Board proceeded on the premise that Yarnell was required to prove that he was unable to work as a result of his industrial injury. The answering brief is to the same effect. However, as Tsuchiyama makes clear, Yarnell's burden was only to establish prima facie that he falls within the odd-lot category. After this showing, the burden shifts.
A number of opinions, beginning with that of Judge Moulton in the original odd-lot decision, have stressed that the burden is on the employer to prove the availability of steady work, once the claimant has been shown to be in the odd-lot category. There is no presumption that, merely because claimant is physically able to do light work, appropriate employment is regularly available to him.
2 A. Larson, supra, § 57.51(c), at 10-164.84(22) to 10-164.84(23) (footnotes omitted).
On this record, Yarnell clearly met his burden. The evidence before the Appeals Board revealed that Yarnell was a 50 year old high school dropout who had spent his entire working life doing heavy manual labor, mainly roofing, building remodeling, and carpet laying. Yarnell failed in his first attempt at vocational rehabilitation; his basic skills were so deficient that he was advised to go to a high school to take a refresher course. Further, Yarnell has endured three serious back operations, which have severely curtailed his ability to do physical labor, as even the IMEs agree. The evidence also showed that Yarnell's right ankle inverts continually, causing him to fall or repeatedly sprain his right foot. In addition to all of his physical problems and educational shortcomings, Yarnell clearly suffers from psychiatric problems secondary to his physical problems, which, his psychiatrist stated in 1981, rendered him "psychiatrically unemployable."
Therefore, it was up to Industrial and City Roofing to "prove the availability of steady work." Id. On this record, they have not done so. Instead, relying on the IME reports, they have shown that Yarnell might be able to engage in some theoretical light occupation that requires no lifting over 25-30 pounds, no bending, no squatting, no kneeling, and no prolonged sitting or standing. Common sense tells us that such a job, if it existed, would not commonly be filled by borderline schizophrenic, high school dropouts with no work experience *1206 other than manual labor. As Professor Larson aptly points out,
[a] considerable number of the odd-lot cases involve claimants whose adaptability to the new situation created by their physical injury was constricted by lack of mental capacity or education. This is a sensible result, since it is a matter of common observation that a man whose sole stock in trade has been the capacity to perform physical movements, and whose ability to make those movements has been impaired by injury, is under a severe disadvantage in acquiring a dependable new means of livelihood.
2 A. Larson, supra, § 57.51(d), at 10-164.84(24), 10-164.84(37) to 10-164.84(38) (footnote omitted).

IV.
Industrial, City Roofing, and Fund argue that the doctrine of collateral estoppel bars a finding that Yarnell is totally disabled, since Yarnell did not appeal the Director's August 24, 1987 finding that Yarnell was "not permanently and totally disabled for work."[1] The argument is without merit.
HRS § 386-87(a) (1985) reads in pertinent part,
A decision of the director shall be final and conclusive between the parties ... unless within twenty days after a copy has been sent to each party, either party appeals therefrom to the appellate board by filing a written notice of appeal with the appellate board or the department.
As noted above, the August 24, 1987 decision determined that Yarnell had not reached medical stability. For that reason, Yarnell's TTD payments were continued. The finding that Yarnell was not permanently and totally disabled was superfluous. As Professor Larson points out,
[r]es judicata does not apply if the issue at stake was not specifically decided in the prior proceeding or, if decided, was not essential to the final decision of the case.
3 A. Larson, Workmen's Compensation Law § 79.72(f), at 15-426.272(100), 15-427 (1989) (footnote omitted). The finding now relied on by Industrial and City Roofing was not essential to the August 24, 1987 decision. Additionally, we agree with the view of the Ohio Supreme Court that:
While res judicata does apply to administrative proceedings, it should be applied with flexibility. The doctrine should be qualified or rejected when its application would contravene an overriding public policy or result in manifest injustice... . Fundamental fairness requires that ... claim[s] be determined on [their] facts, not on legal technicalities. This result is consistent with this state's public policy of construing the law liberally in favor of injured employees.
Jacobs v. Teledyne, Inc., 39 Ohio St.3d 168, 171, 529 N.E.2d 1255, 1259 (1988).
The only decision the Director reached on August 24, 1987, was that Yarnell was not medically stable. That issue is accorded finality by HRS § 386-87(a). The Director did not finally decide the permanent disability issue until his decisions of April 28 and May 16, 1988. The Order affirmed those decisions, and the Order is now before this court. Collateral estoppel does not preclude a determination that Yarnell is permanently and totally disabled.

V.
We vacate the Order and remand the case with instructions to the Appeals Board to enter an order (1) determining that Yarnell is permanently and totally disabled under the odd-lot doctrine; (2) determining the date on which Yarnell became permanently and totally disabled; (3) determining *1207 the amount of benefit adjustment Yarnell is entitled to under HRS § 386-35(a) (1985), since Yarnell's work injury occurred prior to June 18, 1980;[2] and (4) directing Fund to reimburse City Roofing for the additional amount ordered to be paid to Yarnell in accordance with HRS § 386-35(a). HRS § 386-35(b) (1985).[3]
NOTES
[1] In its answering brief, Fund states:

Apportionment with the Fund is not an issue on appeal since Employer/Carrier did not cross appeal from the Board's December 7, 1989 decision denying apportionment. Nevertheless, the Fund has an interest in the outcome of this case because the Fund is liable for benefit adjustment payments pursuant to H.R.S. § 386-35 from the date a claimant, who is injured prior to 1980, is found to be permanently and totally disabled.
[2] Hawaii Revised Statutes (HRS) § 386-35(a) (1985) reads as follows:

Benefit adjustment. (a) Effective June 18, 1980, any employee whose date of work injury is on or before June 18, 1980, and who is at any time after said work injury determined to be permanently and totally disabled shall be paid, without application, a supplemental allowance by the responsible employer calculated in accordance with the following provisions:
(1) In any case where that employee is entitled to receive the maximum weekly income benefit applicable on the date of the employee's work injury, the supplemental allowance shall be an amount which when added to such benefit will equal the maximum weekly benefit as of June 18, 1980.
(2) In any case where that employee is entitled to receive less than the maximum weekly income benefit applicable on the date of the employee's work injury, the supplemental allowance shall be an amount equal to the maximum weekly income benefit as of June 18, 1980, multiplied by the ratio of that employee's weekly income benefit to the maximum weekly income benefit applicable on the date of the employee's work injury, minus that employee's current weekly income benefit.
[3] HRS § 386-35(b) (1985) reads as follows:

(b) The employer shall be entitled to reimbursement from the special compensation fund for the additional amount paid under subsection (a).