**JOHN SMITH**, Plaintiff–Appellant, v. **CUTTER BIOLOGI-CAL, INC.**, a division of Miles Inc., **MILES LABORA-TORIES, INC., TRAVENOL LABORATORIES, INC., AMOUR PHARMACEUTICAL CORPORATION, ALPHA THERAPEUTICS CORPORATION**, and **UNITED STATES OF AMERICA**, Defendants–Appellees

NO. 14754

(NO. 89–15839 – D.C. NO. CV–87–0891)

NOVEMBER 29, 1991

LUM, C.J., PADGETT, HAYASHI, WAKATSUKI, AND MOON, JJ.

418

OPINION OF THE COURT BY LUM, C.J.

This court has accepted a request to address certified questions from the Ninth Circuit Court of Appeals. *Smith v. Cutter Biological, Inc.,* 911 F.2d 374 (9th Cir. 1990).

I.

CERTIFIED QUESTIONS OF LAW

1. Does Hawaii's Blood Shield Law, Haw. Rev. Stat. § 327–51, preclude Smith from bringing a strict liability claim?

2. Does Hawaii's Blood Shield Law, Haw. Rev. Stat. § 327–51, preclude Smith from bringing a negligence claim?

3. Would Hawaii allow recovery in this case when the identity of the actual tortfeasor cannot be proven? If Hawaii would allow recovery, what theory (*i.e.* burden–

> shifting, enterprise liability, market share or other) would the Hawaii Supreme Court adopt?

*Id.* at 376. In considering our responses to the questions, we note that the issue as to questions two and three concerns the causation factor in negligence. The instant problem is that the plaintiff cannot identify which particular defendant caused his injury.

Our consideration of the issues is limited to the facts as stated in this record. Procedurally, this case reached the Ninth Circuit Court on a summary judgment motion. The order granting summary judgment did not rule on duty and breach as to the manufacturers; summary judgment was granted on the basis that plaintiff failed to prove causation.

The other elements of negligence, *i.e.*, duty, breach and damages, are not at issue here. We note that at least two courts have determined, in cases similar to the instant action, that there was no breach of duty. *Jones v. Miles Laboratories, Inc.*, 887 F.2d 1576 (11th Cir. 1989); *McKee v. Cutter Laboratories, Inc.*, 866 F.2d 219 (6th Cir. 1989). However, those cases are distinguishable.[1] We do not render an opinion as to whether appellant here will overcome the obstacles met by plaintiffs in those cases; the duty and breach issues here have not only not been decided, they are not before this court on the certified questions. Therefore, we do not deal with the viability of those questions.

---

[1] The first distinction is that jurisdictionally, those courts' decisions are not controlling here. Second, in *Jones*, the negligence was based on the failure of the defendant to use "high risk" questioning as to the specifics of whether the donor was a homosexual. *Jones*, 887 F.2d at 1580. The decision was based solely on the fact that the donor, who was clearly identified, would not and did not admit that he was a member of one of the "high risk" groups for AIDS. *Id.* at 1581.

In *McKee*, the finding of no negligence was based on the fact that at the time of the decedent's being diagnosed with AIDS in October 1983, industry custom did not require the processes developed later to inactivate the AIDS virus. *McKee*, 866 F.2d at 224. A final distinction is that in both cases, the specific manufacturer was named.

Our conclusions deal only with this case — as it comes to us. Therefore, on our reading of the record as it stands, the relevant statutes, and the relevant case law, we answer "yes" to question one, and "no" to question two. Our answer to question three is "yes," using the alternative market–share theory of recovery, as defined herein.[2]

## II.

Appellant is a hemophiliac who has tested HIV–positive with the AIDS virus.[3] He claims that his exposure to the AIDS virus occurred in 1983 or 1984, through injections of the Antihemophilic Factor Concentrate (Factor VIII or AHF).[4] Factor

---

On the other hand, at least one court has approved application of the market–share theory of liability on facts similar to those herein. *Ray v. Cutter Laboratories*, 754 F. Supp. 193 (M.D. Fla. 1991). *Ray* was also considered at the summary judgment stage, but the federal court adopted the market–share theory as that was the only multi–tortfeasor theory of liability then approved by the state supreme court. *Id.* at 195.

[2] Defendants include not only the manufacturers — Armour Pharmaceutical Corporation, Cutter Biological, Inc., Alpha Therapeutics Corporation, and Travenol Laboratories, Inc. (now Baxter Laboratories) — but also the United States of America (U.S.). The allegations against the U.S. are based on negligence and failure to warn. Although designated as an appellee, the U.S. has not filed an answering brief. We note that the claims against the U.S. are not directly pertinent to the certified questions before this court.

[3] AIDS is an infectious disease caused by a virus, as are herpes, smallpox, yellow fever, and hepatitis. R. Jarvis, M. Closen, D. Hermann, A. Leonard, AIDS LAW IN A NUTSHELL 1 (West 1990) (hereinafter AIDS NUTSHELL). The disease was uniquely recognized in June and July, 1981. *Id.* at 5. There are several modes of infection: 1. sexual intercourse, 2. sharing infected syringes, 3. receipt of human tissue, blood, etc., and 4. childbirth or breast feeding. *Id.* at 7. Once infected, a victim will not test positive for HIV during a "window" period, which lasts between six weeks and six months — although some researchers say the window period may be several years. *Id.* at 14. Although testing positive, a person may continue to be asymptomatic for seven to ten years. *Id.*

[4] Although infection by blood transmission was not the earliest positively identified method of contracting AIDS, in July 1982, three hemophiliacs were

VIII, as more fully discussed in Part III, is a blood protein which enables the blood to properly coagulate when a hemophiliac suffers a bleeding episode. The original source of the Factor VIII is through blood donors.

The United States Tripler Army Medical Hospital (U.S.) was appellant's dispensary for Factor VIII during the period of time in which appellant claims to have been infected. According to appellant, appellee manufacturers [5] furnished to the U.S. the Factor VIII which was used by appellant. Upon appellant's first being tested for HIV antibodies in 1986, the results were positive.

Appellant filed suit against the four appellee manufacturers of Factor VIII for negligence and strict liability. [6] Defendants moved for summary judgment. Despite acknowledging "that this is a case in which it might be reasonable to apply the principles of market

---

diagnosed with *pneumocystic carinii* pneumonia, a form of pneumonia which the early (1981) AIDS patients had developed. *Kozup v. Georgetown University*, 663 F. Supp. 1048, 1051 (D.D.C. 1987), *aff'd in part, vacated in part on other grounds*, 851 F.2d 437 (D.C. Cir. 1988). In December 1982, there was reported a possible transfusion–associated AIDS case. *Id.*

Various meetings addressed the issue. In July 1982, the Public Health Service Committee on Opportunistic Infections in Patients with Hemophilia held an open meeting, at which representatives from the American Red Cross (ARC) and several other blood banking and health organizations participated. *Id.* The report from that meeting stated that "AIDS had 'characteristics which suggest an infectious etiology,' and that a 'possible mode of transmission is via blood products.' " *Id. citing* Exh. E–1 to ARC's motion for summary judgment.

"In January, 1983, a Workgroup to Identify Opportunities for the Prevention of AIDS was convened. . . . [A]s of the date of the meeting, there were five reported cases of AIDS among hemophiliacs." *Id.* The concensus that AIDS was blood transmissible finally came in 1984. *Id.* at 1052. There were some recommendations for screening of donors. *Id.* Not until 1985 did scientists develop seriologic testing to detect antibodies. AIDS NUTSHELL, at 17.

[5] See *supra* note 2, regarding defendants.

[6] Appellant, at one point, attempted to convert this suit to a class action but failed to follow through on the opportunity. Our analysis of the theories of liability might differ were this a class action.

share theory of liability," the district court granted summary judgment in favor of appellees, holding that appellant failed to prove specifically which manufacturer's product caused his infection. Appellant took the case to the Ninth Circuit, which certified the questions to this court.

## III.

The first question asks whether the Hawaii Blood Shield Law precludes a strict liability claim. The blood shield statute reads as follows:

> **Exemption from strict liability.** No physician, surgeon, hospital, blood bank, tissue bank, or other person or entity who donates, obtains, prepares, transplants, injects, transfuses, or otherwise transfers, or who assists or participates in obtaining, preparing, transplanting, injecting, transfusing, or otherwise transferring any tissue, organ, ***blood or component thereof***, from one or more persons, living or dead, to another person, shall be liable as a result of any such activity, save and except that each such person or entity shall remain liable for the person's or ***its own negligence*** or wilful misconduct.

Hawaii Revised Statutes (HRS) § 327–51 (1985) (emphasis added). The answer to this question then depends on whether Factor VIII can be categorized as a "blood component." Appellant argues that the legislature was merely referring to blood or blood plasma for the definition of blood component. The legislative history does not appear to us to be that narrow. The history states that:

> Th[e] bill . . . provide[s] an exception to the doctrine of strict liability on tort when there is a transfer of part of the human organism from one person to another. . . . [T]he imposition of strict liability upon persons . . .

> engaged in scientific procedures dealing with . . . preparing . . . human . . . blood[] or component thereof could inhibit, at the expense of the health and welfare of the people of Hawaii, the exercise of sound medical judgment in this area and may restrict the availability of important scientific knowledge and skills.

Sen. Conf. Comm. Rep. No. 773, in 1971 Senate Journal, at 1135. We do not believe that "preparing blood components" of humans, as noted in the history quoted, intends a limitation to blood or blood plasma. The legislature declined to define that phrase.

Looking to the definition by the federal Food and Drug Administration, a component "means that part of a single–donor unit of blood separated by physical or mechanical means." 21 C.F.R. § 606.3(c) (1990).[7] Factor VIII is a blood protein, essential for normal coagulation, which can be extracted from human blood. The extraction involves a process called plasmapheresis. That process separates part of the blood, called cryoprecipitate, from whole blood.[8] The clotting factors making up Factor VIII are obtained from the cryoprecipitate, and then freeze–dried. Factor VIII's usefulness is substantially greater than cryoprecipitate, which, prior to the refinement of Factor VIII, was the primary treatment for hemophilia.

Therefore, we believe that Factor VIII is a component prepared from blood. *See also Roe v. Miles Laboratories, Inc.*, 740 F. Supp. 740 (D. Alaska 1989). With that finding, we answer the first question in the affirmative; Hawaii's blood shield statute precludes a strict liability claim.

---

[7] The part referenced in the federal regulations is titled "Current good manufacturing practice for blood and blood components."

[8] Standards for obtaining cryoprecipitate and process control for plasma are also regulated. 21 C.F.R. §§ 640 and 606.110 respectively.

## IV.

The second question is tied to the third question. It requires that this court decide what the Hawaii blood shield statute means by the phrase "its own negligence." Appellees' argument is that the phrase bars a lawsuit where the tortfeasor cannot be positively identified. In other words, the question is virtually identical to the first query in the third certified question. The distinction is, in the first instance, whether the legislature, by means of the blood shield statute, allows a claim against an unidentified tortfeasor, and in the second instance, whether this court would allow such an action based on the general development of Hawaii tort law. If "its own negligence" literally means the negligence must be of that particular defendant and have caused the damage to the plaintiff, then there would be no room to consider any of the various multi-tortfeasor theories of liability.

Looking at the legislative history behind the blood shield statute, we note that it merely states that excluding strict liability does not "affect remedies based upon other legal theories, such as negligence or willful misconduct." Sen. Conf. Comm. Rep. No. 773, in 1971 Senate Journal, at 1135. The wording on which appellees rely so heavily, "own negligence," is conspicuously absent from the history. Lacking that wording, or any other wording giving such an indication, we believe that the legislature has not spoken on this issue. We believe a lacuna exists, and we are free to use our own determination to explain pertinent words in the blood shield statute. Therefore, the second question is answered in the negative.

## V.

The final question posed to this court comes in two parts. The first part asks whether this court would allow recovery in negligence when the actual tortfeasor cannot be proven. We concluded,

in Part IV, that the Hawaii blood shield statute does not mandate specific identification of the tortfeasor. We now consider whether general Hawaii tort law would allow the action.

The reason this case is before this court is because the legislature has not fully legislated in the field of torts. When the occasion arises for which there is no specific rule to apply, "we are free to fashion an appropriate rule of law." *Armstrong v. Cione*, 69 Haw. 176, 738 P.2d 79 (1987). We must consider what justification there is for deviating from the traditional proof in a negligence case, which, as this court has previously said, includes the factor of causation. *See Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 385, 742 P.2d 377, 387 (1987).

Appellees take issue with applying theories which were developed, in a large part, for remedies in the field of diethylstilbestrol (DES) drug litigation and the inherent problems associated with those actions.[9] Their strongest argument against using these theo-

---

[9] The precursor of the DES cases is *Sindell v. Abbott Laboratories*, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S. Ct. 285, 66 L. Ed. 2d 140 (1980). *Sindell* arose when demurrers were sustained as to several manufacturers of DES, on the basis that plaintiff could not identify whose product caused the injury. *Id.* at 134, 607 P.2d at 926–27 n.3. The *Sindell* court considered the four main theories.

Michigan approved both the concert of action and alternate liability theories in a DES case up on summary judgment. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, *cert. denied*, 469 U.S. 833, 105 S. Ct. 123, 83 L. Ed. 2d 65 (1984). In the same year, the Washington Supreme Court addressed the issue on appeal from summary judgment, in *Martin v. Abbott Laboratories*, 102 Wash. 2d 581, 689 P.2d 368 (1984). The *Martin* court reanalyzed the theories enumerated in *Sindell*, and then created the market–share alternate liability.

A federal court in Illinois tentatively allowed the alternate liability theory in a DES case, acknowledging that the Illinois Supreme Court had not yet addressed the issue. *Poole v. Alpha Therapeutic Corp.*, 696 F. Supp. 351 (N.D. Ill. 1988). Later, the Illinois Supreme Court did address a DES case, but only as to the market–share theory of liability — which it refused to adopt. *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 560 N.E.2d 324 (1990).

In New York, as in Florida, state courts adopted market–share theories as viable in DES cases. *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 539 N.E.2d

ries is the lack of comparison of DES to Factor VIII as a fungible product. DES was produced by more than 200 different companies, some of which are defunct, but the identical formula was used universally in a highly regulated industry. With Factor VIII, there are only a handful of manufacturers, and although the product is fungible insofar as it can be used interchangeably, it does not have the constant quality of DES. The reason is obvious — the donor source of the plasma is not a constant. Therefore, Factor VIII is only harmful if the donor was infected; DES is inherently harmful. As we see that the lack of screening of donors and failure to warn are the breaches alleged, appellees' argument for not using DES theories is not convincing. We find consideration of the theories discussed in the DES cases to be helpful, as we strive to find an equitable and fair solution to the case at bar.

Our initial reference is to the reasoning of the Supreme Court of California, in *Sindell v. Abbott Laboratories*, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S. Ct. 285, 66 L. Ed. 2d 140 (1980). We subscribe to the policy reasons propounded in *Sindell*, and discussed *infra*, for by-passing the identification requirement.

In addition, we note that tort law is a continually expanding field. As discussed in the American Law Institute Enterprise Responsibility for Personal Injuries — Reporter's Study (1991) (ALI Study), the field of torts has now expanded to include personal injury actions described in three tiers of actions. I ALI Study 9. These are loosely defined as first, the traditional level which includes accidents where an individual defendant causes harm to a stranger. The second level includes product defects and medical mishaps which include high stakes cases with erratic jury

---

1069, *cert. denied*, 493 U.S. 944, 110 S. Ct. 350, 107 L. Ed. 2d 338 (1989) (on certified questions and adopting the national market as the base market); *Conley v. Boyle Drug Co.*, 570 So. 2d 275 (Fla. 1990) (adopting Washington's version of market-share liability, and summarily disposing of the other theories).

results. Finally, the third tier includes "mass" torts where toxic exposure to many plaintiffs may, many years later, cause cancer or other illness. *Id.* at 9–10. It is this final tier with which this case deals. It necessitates considering how to fairly deal with the plight of plaintiffs unable to identify, for no fault of their own, the person or entity who should bear the liability for their injury.

No longer can we apply traditional rules of negligence, such as those used in individual and low level negligence to mass tort cases, especially here, where we are dealing with a pharmaceutical industry that dispenses drugs on a wide scale that could cause massive injuries to the public, and where fungibility makes the strict requirements difficult to meet. The problem calls for adopting new rules of causation, for otherwise innocent plaintiffs would be left without a remedy. We concede that there is a difference of opinion regarding the need for this change. For instance, in regard to DES cases, the Illinois Supreme Court refused to adopt the market–share theory of liability, in part because "[a]cceptance of market share liability and the concomitant burden placed on the courts and the parties will imprudently bog down the judiciary in an almost futile endeavor." *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 253, 560 N.E.2d 324, 338 (1990). In addition, that court criticized the fairness of results in apportioning damage when reliable information on all manufacturers might not be available. *Id.* Part of that reasoning, of course, is based on the fact that the potential number of defendants in DES cases extends into the hundreds. *Id.* at 254, 560 N.E.2d at 338. The numbers here are not nearly so large, and therefore, the harshness of the result, that is, burdening the innocent plaintiff without a remedy, to us seems totally unfair and out of step with current efforts to allow recovery when the proper case is brought.

The policies in *Sindell* and *Hall* convince us that it is appropriate to consider a negligence action where the actual tortfeasor cannot be proven. Therefore, although inherent in the proof of

negligence is proof of causation, we believe that this state is amenable to consideration of group theories of liability.

## VI.

The second part of the third certified question asks what theory or theories this court might adopt where the tortfeasor cannot be proven. There are several theories which have evolved in the last several years. The genesis of these theories comes from *Sindell v. Abbott Laboratories*, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied,* 449 U.S. 912, 101 S. Ct. 285, 66 L. Ed. 2d 140 (1980). The theories are generally described as: alternative liability, concert of action, enterprise or industry–wide liability, and market–share liability. In the evolution of the DES cases, the market–share theory has undergone various modifications, to suit the policies and needs of the particular courts.

### A. Alternative Liability

This theory is epitomized in the well–known case of *Summers v. Tice*, 33 Cal. 2d 80, 199 P.2d 1 (1948). In that case, two hunters negligently shot in the direction of the plaintiff; one of them injured him. Upon deciding that both were wrongdoers and negligent to the plaintiff, the court felt that it was unfair to leave an impossible burden of proof on the plaintiff, and shifted that burden to the defendants to absolve themselves. The rule of *Summers v. Tice* is included in the Restatement (Second) of Torts (Restatement) as follows:

> Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm.

RESTATEMENT § 433B(3) (1965). The comments in the Restatement also suggest that this theory may appropriately be subject to modification at a later time. *Id.* comment h.

Two presumptions follow this theory. First, the plaintiff must prove that "all defendants acted tortiously and that the harm resulted from the conduct of one of them." *Sindell*, 163 Cal. Rptr. at 139, 607 P.2d at 931 n.16, *citing* RESTATEMENT § 433B comment g. This has been interpreted to mean that the tortious actions must occur simultaneously. *Starling v. Seaboard Coast Line R.R.*, 533 F. Supp. 183, 191 (S.D. Ga. 1982) (court considering theories in asbestos related injury). However, another court, in applying the theory in a Factor VIII case, disagreed. *See Poole v. Alpha Therapeutic Corp.*, 696 F. Supp. 351, 356 (N.D. Ill. 1988).

Second, all responsible parties must be joined. *Sindell*, 163 Cal. Rptr. at 139, 607 P.2d at 930–31. Typically, this theory is useful in multiple car crash cases, cases of pollution by several defendants, and injury during medical operations where the plaintiff is sedated. *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 822–23 (E.D.N.Y. 1984), *aff'd*, 818 F.2d 145 (1987), *cert. denied*, 484 U.S. 1004, 108 S. Ct. 695, 98 L. Ed. 2d 648 (1988). Additionally, however, joint and several liability is inherent in the application of alternative liability.

We choose not to alter the theory to the point that it would be useful on the facts here. Several problems arise which lead us to this decision. First, we look at the various theories of negligence which appellant suggested. One argument is that there was a duty to properly select and screen donors; other arguments follow the same line of reasoning — that the manufacturers should have implemented verified surrogate laboratory tests, or that they should have ceased using plasma from donor centers where the population groups had significant numbers of AIDS incidents. It is obvious that each manufacturer acted at various different times, so the simultaneous requirement of a strict application of the theory

fails. Also, although appellant has alleged that manufacturers are "most" of the possible tortfeasors, and the manufacturers have not clearly rebutted that argument, it is still subject to factual proof and findings. Finally, we do not believe that joint and several liability is appropriate under the circumstances of this case. Therefore, this theory cannot be applied here, unless modified, and we choose not to do so based on these facts, as other theories, discussed *infra*, have already been appropriately modified.

## B. Concert of Action

This theory derives from the criminal law concept of aiding and abetting. *Starling*, 533 F. Supp. at 187. *See* RESTATEMENT § 876. Concert of action is usually applied with a small number of defendants, a single plaintiff, and a short time period between the tort and its discovery. The defendants' joint plan is the basis of the cause of action, and most often the plaintiff is able to identify which defendant actually caused the injury. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 338, 343 N.W.2d 164, 176, *cert. denied*, 469 U.S. 833, 105 S. Ct. 123, 83 L. Ed. 2d 65 (1984). [10] The court stated that the identification did not preclude use of the theory. *Id.* According to the court, the only burden of plaintiffs to withstand a summary judgment motion, for failure to state a cause of action, was to "allege that the defendants were jointly engaged in tortious activity as a result of which the plaintiff was harmed." *Id.* Inherent in this theory is the application of joint and several liability. As the Michigan court also stated, "[i]f plaintiffs can establish that all defendants acted tortiously pursuant to a common design, they will all be held liable for the entire result." *Id.*

---

[10] The Michigan court allowed this theory to be applied in a DES case, which had reached the court on summary judgment, where it appeared the plaintiff could identify the tortfeasor. *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164, *cert denied*, 469 U.S. 833, 105 S. Ct. 123, 83 L. Ed. 2d 65 (1984).

Even if we thought this theory appropriate in a Factor VIII case, again, we do not wish to burden defendants with joint and several liability. Therefore, we choose not to allow this theory to be applied to this case.

## C. Enterprise or Industry–Wide Liability

The essence of the enterprise theory is that there is joint control of the risk throughout a particular industry. The theory originated in the blasting caps case, *Hall v. E.I. Du Pont de Nemours & Co.*, 345 F. Supp. 353 (E.D. N.Y. 1972). The basis of the case was that there was an industry–wide standard concerning safety; the safety planning was delegated to a central group; and there was cooperation in the manufacture and design. Policy dictates that when all of those facts occur, the entire enterprise is liable. Therefore, the industry–wide standard became the cause of the plaintiff's injury.

The main premise against this theory is stated in one of the DES cases:

> The underlying rationale in all of the decisions rejecting enterprise liability is that the law of torts does not include a theory of liability which would allow an entire industry to be held strictly liable for an injury caused by a defective product. Enterprise liability as described in *Hall* is predicated upon industry–wide cooperation of a much greater degree than that alleged by the plaintiff.

*Martin v. Abbott Laboratories*, 102 Wash. 2d 581, 600, 689 P.2d 368, 380 (1984). That premise is directly disputable by reading *Hall*, as the court states:

> There is thus no support for defendants' argument that to establish joint control of risk, plaintiffs must demonstrate that the explosives industry was "rigidly

controlled" through the trade association with regard to blasting cap design, . . . and that the object of such control was some particularly reprehensible breach of duty. The variety of business and property relationships in which joint control of risk has been found demonstrates the flexibility of the doctrine. Liability is not limited to particular formal modes of cooperation, nor to illegal or grossly negligent activities.

345 F. Supp. at 374.

However, another court has aptly stated the plaintiff's burden of proof with a showing:

(1) that the product was manufactured by one of a small number of defendants in an industry; (2) the defendants had a joint capacity to reduce the risks of the product; and (3) each of them failed to take steps to reduce the risk at a substantially concurrent time by delegating their responsibility to an association.

*Conley v. Boyle Drug Co.*, 477 So. 2d 600, 604 (Fla. App. 1985), *rev'd on other grounds*, 570 So. 2d 275 (Fla. 1990) (specifically approving the analysis of the lower court as to alternative, concert of action, enterprise, and *Sindell* market–share theories of liability).

Based on the steps as set forth in *Conley*, the enterprise theory appears to be a somewhat persuasive method of approaching this case. We note that the pleadings do not raise the allegation that the defendants had the joint capacity to reduce the risk. Appellant does not even argue this theory in his opening brief; however, the facts alleged in the brief lend credibility to this type of argument. Were it not that we are again faced with the inherent application of joint liability, and the fact in addition that we find one aspect of the *Hall* scenario convincingly distinguishable, we might endorse this theory in answer to the certified question.

First, we mention the distinguishable characteristic of *Hall*, which is convincingly pointed out to us by appellees and the court in *Sindell v. Abbott Laboratories*, 163 Cal. Rptr. 132, 607 P.2d 924, *cert denied*, 449 U.S. 912, 101 S. Ct. 285, 66 L. Ed. 2d 140 (1980). The court there noted that "the drug industry is closely regulated by the Food and Drug Administration, . . . [t]o a considerable degree, therefore, the standards followed by drug manufacturers are suggested or compelled by the government." *Id.* at 143, 607 P.2d at 935. With the government in control of the parties' actions, it is unfair to hold them liable for following the standards. Appellees' arguments convince us that such reasoning is appropriate here, too, to eliminate this theory on these facts.

We further digress to expound on our reluctance to adopt joint liability in the Factor VIII cases. First, as we are writing a new chapter in tort law in the State of Hawaii, we endeavor to set principles which we think would be adopted by our legislature. We note that by statute, joint and several liability in tort was abolished to some extent as of October 1991. HRS § 663–10.9 (Supp. 1990). As to what is still allowed, damages are still limited by the doctrine of modified comparative negligence. HRS § 663–31 (1985). Therefore, we believe the legislature has seen a need to balance the equities in this evolving field.

In addition, as noted by many of the opinions in DES cases, there is an inherent unfairness in holding one or two parties responsible in full for the actions of tortfeasors who may escape liability for some reason. It seems at least a fair trade–off, where the plaintiff cannot identify which party actually caused his injuries, to at least allow the defendants to limit their share of liability to their relative proportion of the market. Therefore, we move on to discuss, and endorse, market–share liability, with modifications.

### D. Market–Share Liability and Its Progeny

This theory has been most susceptible to variations and refinements, especially in DES litigation, but also in line with the

law of the state in which it has been applied. It was first defined in *Sindell*, 163 Cal. Rptr. 132, 607 P.2d 924, *cert. denied*, 449 U.S. 912, 101 S. Ct. 285, 66 L. Ed. 2d 140 (1980). The policies there stated included: 1. the reasoning of *Summers v. Tice*, 33 Cal. 2d 80, 199 P.2d 1 (1948), that between innocent plaintiffs and negligent defendants, the negligent parties should be held liable; 2. advances in science and the creation of fungible goods whose source cannot be traced; 3. the financial ability of defendants to bear the costs; and 4. the fact that manufacturers are in a better position to prevent defective products from reaching the consumer market. *Sindell*, 163 Cal. Rptr. at 144, 607 P.2d at 936. We expand on those policies to acknowledge that defendants may bear the loss by passing that cost of doing business on to consumers. In addition, we feel that equity and fairness call for using the market–share approach. Another justification is that where many drugs can be lethal, and it is difficult for the consumer to identify the source of the product, the burden should shift. The concept itself meets the objectives of tort law, both by providing plaintiffs a remedy, but also by deterring defendants from negligent acts.

After stating its policies, the *Sindell* court stated:

> [W]e hold it to be reasonable in the present context to measure the likelihood that any of the defendants supplied the product which allegedly injured plaintiff by the percentage which the DES sold by each of them for the purpose of preventing miscarriage bears to the entire production of the drug sold by all for that purpose.

*Id.* at 145, 607 P.2d at 937. Included in the definition was a requirement that a substantial percentage of the market must be joined as defendants, and that an exculpatory clause be included. *Id.* We feel that this basic theory, with modifications and distinctions to suit the policies of this state, discussed *infra*, provides an appropriate modem for appellant's case. The relevant considera-

tions are: 1. defining the market, 2. identification and joint and several liability, and finally 3. exculpatory allowances.

### 1. Defining the Market

Criticisms of *Sindell* include the need for a definition of "substantial share" of the market, in order not to distort the share of liability. *Martin v. Abbott Laboratories*, 102 Wash. 2d 581, 602, 689 P.2d 368, 381 (1984). The *Martin* court adopted a narrow definition of the market, that being the plaintiff's particular geographic market. *Id.* at 605, 689 P.2d at 382. The justification is that the narrow market share purports to make a "particular defendant's potential liability . . . proportional to the probability that it caused plaintiff's injury." *Id.* This policy was later reaffirmed by the same court, with acknowledgement that lacking evidence of the specific market, then "other figures, . . . such as within the county, state, or even in the country may in certain circumstances be introduced." *George v. Parke–Davis*, 107 Wash. 2d 584, 592, 733 P.2d 507, 512 (1987). The Florida Supreme Court, in *Conley v. Boyle Drug Co.*, 570 So. 2d 275 (Fla. 1990), agreed with the Washington court that the relevant market should be "as narrowly defined as the evidence in a given case allows." *Id.* at 284. The court found this manner of definition to be consistent with the *Martin* theory of allowing a defendant to exculpate itself by showing no participation in that market. It does meet the goal of market–share liability to impose liability only on those companies who could have manufactured the injurious product.

Another court has specifically adopted the national market as the best option. *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 511, 539 N.E.2d 1069, 1077, *cert. denied*, 493 U.S. 944, 110 S. Ct. 350, 107 L. Ed. 2d 338 (1989). Several premises supported this holding: 1. it was difficult to reliably determine any market smaller than the national one, 2. it avoided the need to establish separate

matrices as to market share, and 3. it avoided an unfair burden on litigants. *Id.* at 511, 539 N.E.2d at 1077. The national market was intended to "apportion liability so as to correspond to the over–all culpability of each defendant, measured by the amount of risk of injury each defendant created to the public–at–large." *Id.* at 512, 539 N.E.2d at 1078. This provides equitable relief for plaintiffs, and a rational distribution of responsibility among defendants. It also avoids a windfall escape to the producer who happens to sell only to certain distributors. The culpability, therefore, is for marketing the product.

As we are faced here with a minimal number of manufacturers of the product, we believe that culpability for marketing the product is a better policy. Should the issue arise under different circumstances at some point, we may find it appropriate to narrow the definition. For this case, however, we believe the national market is the more equitable consideration.

## 2. Identification and Joint and Several Liability

Courts differ on their requirements of an assertive effort on the part of plaintiffs to identify the actual manufacturer of the specific product which caused the harm. We take another approach to this concern. Whereas manufacturers here argue that appellant should have kept a log of which manufacturer's product he was using, we fail to see how such failure affects the viability of appellant's suit in view of our adoption of the theory of market–share liability.

Plaintiffs should use due diligence to join all manufacturers, but failure to do so is not a defense. Failure to do so may affect the percentage of recovery, discussed *infra*. However, manufacturers are permitted to implead other manufacturers. But, in this case, all manufacturers are joined, so the issue is not before us. However, we note in passing that the conditions of the *Martin* court, which would allow plaintiffs to initiate suit against only one defendant,

and of *Sindell*, which would require plaintiffs to join a "substantial" number of defendants, are immaterial as long as plaintiffs realize their recovery will depend on joining as many manufacturers as they can; plaintiffs will endeavor to join all manufacturers.

We have already discussed our feeling that this action should not be subject to joint liability. We simply reiterate what other courts have said on this point, that " '[t]he cornerstone of market share alternate liability is that if a defendant can establish its actual market share, it will not be liable under any circumstances for more than that percentage of the plaintiff's total injuries.' " *Conley*, 570 So. 2d at 285, *quoting George v. Parke–Davis*, 107 Wash. 2d at 595, 733 P.2d at 513. Therefore, we advocate several liability.

We define the rules of distribution as to market share for this case as was done in *Martin*, that is:

> The defendants that are unable to exculpate themselves from potential liability are designated members of the plaintiffs' . . . market[] . . . . These defendants are initially presumed to have equal shares of the market and are liable for only the percentage of plaintiff's judgment that represents their presumptive share of the market. These defendants are entitled to rebut this presumption and thereby reduce their potential liability by establishing their respective market share of [Factor VIII] in the . . . market.

*Martin*, 102 Wash. 2d at 605, 689 P.2d at 383. As to several liability, we adopt the theory that a particular defendant is only liable for its market share. Defendants failing to establish their proportionate share of the market will be liable for the difference in the judgment to 100 percent of the market. However, should plaintiff fail to name *all* members of the market, the plaintiff will not recover 100 percent of the judgment if the named defendants prove an aggregate share of less than 100 percent.

### 3. Exculpatory Allowances

As a result of our determination that a national market is appropriate, as long as defendant is actually one of the producers of Factor VIII, there is little to justify exculpation of defendant. However, the exception would occur where defendant could prove that it had no product on the market at the time of the injury. As far as the defendants in this suit are concerned, it appears that none of them would be able to escape liability on that basis.[11]

### VII.

In conclusion, we will recognize the basic market–share theory of multi–tortfeasor liability, as defined herein. Acknowledging that this could open a Pandora's box of questions, we believe that we have defined at least a starting point as to appropriately responding to the certified questions. However, as we are deciding issues in a virtual factual vacuum, we recognize that our opinion is limited to the facts presented to us, and we reserve the right to modify or amend our answers to these questions.

*John Rapp* and *Charles Kozak* for plaintiff–appellant.

*Richard L. Berkman, Pro Hac Vice* (Dechert Price & Rhoads, of counsel, of Pennsylvania; *Arthur F. Roeca*, Roeca & Louie, of counsel, of Honolulu, with him on the brief) for defendant–appellee Baxter Healthcare Corporation, fka Travenol Laboratories, Inc.

---

[11] One of the difficulties which appellant will have, and we acknowledge that the district court noted the problem earlier, is pinpointing when his injury occurred. That will be necessary as duty must be defined at that period of time.

*Geoffrey R. W. Smith, Pro Hac Vice* (McDermott, Will & Smith, of counsel, of Washington, D.C.; *Burnham H. Greeley* and *Janice T. Futa*, Greeley, Walker & Kowen, of counsel, of Honolulu; *Duncan Barr* and *Deborah H. Leibman, Pro Hac Vice*, O'Connor, Cohn, Dillon & Barr, of counsel, of California, with him on the brief) for defendant–appellee Cutter Laboratories.

## CONCURRING AND DISSENTING OPINION
## BY MOON, J.

I concur in the majority's decision that Hawaii's blood shield statute precludes plaintiff's claim for strict liability. I also concur in the majority's opinion to the extent that it rejects the alternative liability, concert of action, and enterprise liability theories of causation. However, as to the majority's decision to adopt the market–share theory of liability, I respectfully dissent.

The majority's endorsement of the market–share theory of liability is contrary to established rules of statutory construction and contravenes the intent of the Hawaii legislature in enacting Hawaii's blood shield statute. The policy considerations which underlie our blood shield law preclude the adoption of a negligence theory that abandons the fundamental principle of causation and shifts the burden to defendants to exonerate themselves. Moreover, the case law upon which the majority relies requires that Factor VIII be fungible and untraceable to specific manufacturers in order for market–share liability to be appropriate. However, Factor VIII is not fungible and it is not impossible for hemophiliacs or other Factor VIII users to identify the manufacturers of the Factor VIII concentrates they used.

Furthermore, the majority's departure from well–established tort law in Hawaii is based on a factual record that prevents plaintiff from establishing the existence of a legal duty and breach of

that duty, based on a provable standard of care, which is essential to the application of the market–share theory of liability.

## I. Statutory Construction

Initially, it is important to note that until today, negligence liability under Hawaii law required a plaintiff to prove by a preponderance of the evidence four essential elements: 1) the existence of a legal duty; 2) breach of that duty; 3) causation; and 4) injury. *Knodle v. Waikiki Gateway Hotel, Inc.*, 69 Haw. 376, 742 P.2d 377 (1987). However, the market–share liability theory imposes liability without requiring identification of the wrongdoers who caused plaintiff's harm and shifts the burden to defendants to prove that they did not cause the plaintiff's injury. Eliminating causation as an element of proof and shifting the burden to the defendant is not only a radical departure from traditional negligence law, but is inconsistent with Hawaii's blood shield statute.

This court has stated that the fundamental starting point for statutory construction is the language of the statute itself; where the statute's language is plain and unambiguous, this court's sole duty is to give effect to its plain and obvious meaning. *National Union Fire Ins. Co. v. Ferreira*, 71 Haw. 341, 790 P.2d 910 (1990); *Kaiser Found. Health Plan, Inc. v. Department of Labor and Indus. Relations, Unemployment Ins. Div.*, 70 Haw. 72, 762 P.2d 796 (1988).

Hawaii's blood shield statute provides as follows:

> **Exemption from strict liability.** No physician, surgeon, hospital, blood bank, tissue bank, or other person or entity who donates, obtains, prepares, transplants, injects, transfuses, or otherwise transfers, or who assists or participates in obtaining, preparing, transplanting, injecting, transfusing, or otherwise transferring any tissue, organ,

> blood or component thereof, from one or more persons, living or dead, to another person, shall be liable as a result of any such activity, save and except that each such person or entity shall remain liable for the person's or its *own negligence* or wilful misconduct.

Hawaii Revised Statutes (HRS) § 327–51 (1985) (emphasis added).

The statute is plain and unambiguous. It protects manufacturers of blood products from all liability, with one exception: "save and except that each . . . entity shall remain liable for . . . its *own negligence.*" (Emphasis added). In other words, the statute requires proof of all elements of a negligence action, including causation.

This court has also stated that where a statute is clear on its face, there is no need to rely on legislative history to construe it. *Flores v. United Air Lines, Inc.,* 70 Haw. 1, 11, 757 P.2d 641, 646 (1988). However, despite the clear meaning of the statute, the majority looks to the legislative history of the blood shield statute and concludes that

> [t]he wording on which appellees rely so heavily, "own negligence," is conspicuously absent from the history. Lacking that wording, or any other wording giving such an indication, we believe that the legislature has not spoken on this issue. We believe a lacuna exists, and *we are free to use our own determination to explain pertinent words in the blood shield statute.*

(Emphasis added.) This novel approach to statutory construction is inappropriate because it allows the majority to attain a desired result without regard to the established rules of statutory construction. Recently, Justice Scalia, in criticizing the Supreme Court's construction of the Voting Rights Act of 1965, stated:

> Today, however, the Court adopts a method [for interpreting the meaning of language in a statute] quite

out of accord with that usual practice. It begins not with what the statute says, but with an expectation about what the statute must mean absent particular phenomena . . . and the Court then interprets the words of the statute to fulfill its expectation. . . .

*As method, this is just backwards, and however much we may be attracted by the result it produces in a particular case, we should in every case resist it.* Our job begins with a text that Congress has passed and the President has signed. We are to read the words of that text as any ordinary Member of Congress would have read them . . . and apply the meaning so determined.

*Chisom v. Roemer,* 111 S. Ct. 2354, 2369 (1991) (Scalia, J., dissenting) (emphasis added).

Hawaii's blood shield statute, enacted in 1971 as House Bill No. 666, was entitled:

A BILL FOR AN ACT PROVIDING THAT PERSONS ENGAGED IN THE TRANSPLANTATION OR TRANSFUSION OF HUMAN TISSUES AND RELATED PURPOSES SHALL NOT BE LIABLE FOR DAMAGES *EXCEPT FOR THEIR OWN NEGLI- GENCE* OR WILLFUL MISCONDUCT.

(Emphasis added.) The majority's conclusion that " 'own negligence,' is conspicuously absent from the history" is erroneous because the title to the bill demonstrates that the statute was intended to insulate manufacturers, like the defendants, from any liability, "except for their *own negligence.*" *See Honolulu Star Bulletin, Ltd. v. Burns,* 50 Haw. 603, 606, 446 P.2d 171, 173 (1968) (the title of an act may be referred to as an aid in construing a statute). Moreover, the Standing Committee Report of the Senate Judiciary Committee clearly underscores the legislature's intent to protect those who prepare blood components. The Committee noted that "the purpose of this bill is to *limit the legal liability*

arising out of certain scientific procedures . . . ," and further explained that

> [t]his bill would provide an exception to the doctrine of strict liability on tort when there is a transfer of part of the human organism from one person to another. It is felt that the imposition of strict liability upon persons or organizations engaged in scientific procedures dealing with donating, obtaining, preparing, transplanting, injection, transfusing, or otherwise transferring of human tissue, organ, blood or component thereof could inhibit, at the expense of the health and welfare of the people of Hawaii, the exercise of sound medical judgment in this area and may restrict the availability of important scientific knowledge and skills.

Sen. Stand. Comm. Rep. No. 773, in 1971 Senate Journal, at 1135 (emphasis added). Thus, review of the legislative history clearly demonstrates that, contrary to the majority's view, the legislature has "spoken on this issue."

When the legislature enacted Hawaii's blood shield law in 1971, it was confronted with the doctrine of strict liability in tort, which had recently been adopted in 1970 by this court in the products liability case of *Stewart v. Budget Rent–A–Car Corp.*, 52 Haw. 71, 470 P.2d 240 (1970). The legislature considered this expansive theory of products liability, which deviated from traditional negligence law, and specifically chose to eliminate it from the blood shield statute. In view of such explicit legislative action, it is unreasonable for the majority to claim that "a lacuna exists" where the market–share theory of liability poses the identical concerns the legislature faced when it exempted strict liability from the blood shield statute.

Hawaii's blood shield statute is similar to blood statutes enacted in virtually all states. Even in the absence of legislative history, the underlying purpose of such statutes is obvious. In

*Zichichi v. Middlesex Memorial Hospital*, 204 Conn. 399, 528 A.2d 805 (1987), the Connecticut Supreme Court stated:

> Our conclusion is also consistent with policy behind the enactment of the blood shield statute. Although the legislative history of § 19a–280 [Connecticut's blood shield statute] is virtually nonexistent, one of the driving forces behind the promulgation of "blood shield" statutes, such as § 19a–280, is to ensure that certain medical services, namely, the provision of blood and tissue, remain available to citizens in need of such services. As one court aptly stated, "[t]he public policy represented by these statutes is not difficult to discern: blood transfusions are essential in the medical area. . . ." *These statutes reflect a legislative judgment that to require providers to serve as insurers of the safety of these materials might impose such an overwhelming burden as to discourage the gathering and distribution of blood.*

*Zichichi*, 204 Conn. at 409, 528 A.2d at 810 (quoting *Garvey v. St. Elizabeth Hosp.*, 103 Wash. 2d 756, 759, 697 P.2d 248, 249 (1985)) (emphasis added).

In 1988, the American Medical Association reported that "in the pharmaceutical industry, meaningful product liability insurance has all but disappeared." A.M.A., *Report of the Board of Trustees on Impact of Product Liability on the Development of New Medical Technologies* 2 (1988). This lack of insurance is largely due to the development of nonidentification theories of liability. [1]

---

[1] *See* United States Department of Justice, *Report of the Tort Policy Working Group on the Causes, Extent and Policy Implication of the Current Crisis in Insurance Availability and Affordability* 33–35 (Washington, D.C. Government Printing Office, Feb. 1986).

The application of the market–share liability theory may result in liability being placed on defendants bearing no responsibility for the defective product and may create unpredictable costs to innocent parties. In enacting HRS § 327–51, the Hawaii legislature unquestionably sought to guard against the risk of adversely affecting the supply of blood and blood components. However, the majority's decision imposes that very risk and may not only jeopardize the supply of blood products which protect the "health . . . of the people of Hawaii," but may also "restrict the availability of important scientific knowledge and skills." I submit that had the legislature intended to sanction such an expansive theory of liability as that advocated by the majority, it would not have used the restrictive phrase "own negligence" in the statute nor would we find the legislative history so consistent with the statute's language.

## II.  DES Case Law

The primary authority cited by the majority in support of its position is the DES case of *Sindell v. Abbott Laboratories,* 26 Cal. 3d 588, 607 P.2d 924, 163 Cal. Rptr. 132, *cert. denied,* 449 U.S. 912 (1980), which was the first to judicially promulgate the market–share liability theory. In *Sindell,* the "DES daughter" plaintiff sought to recover damages for injuries resulting from cancer caused by DES, a miscarriage preventative. The mother ingested the drug over twenty years prior to the cause of action being filed. The trial court dismissed the action on the ground that plaintiff had conceded that the specific manufacturers of the drug could not be identified.

On appeal, the Supreme Court of California adopted the market–share liability theory, which relieved plaintiff of the burden of identifying which of over 200 companies manufactured the DES drug ingested by her mother. The court, in reaching this

conclusion, reasoned: "In our contemporary complex industrialized society, advances in science and technology create fungible goods which may harm consumers and which cannot be traced to any specific producer." *Sindell,* 26 Cal. 3d at 610, 607 P.2d at 936, 163 Cal. Rptr. at 144. The court determined that two essential factual elements, fungibility and the inability to identify specific producers, must be present in order for the market–share liability theory to be appropriate. Both elements are glaringly absent in the Factor VIII case before us.

## A. Fungibility

The *Sindell* court determined that DES was fungible or interchangeable because all DES companies produced the drug from an identical formula; it was usually manufactured as a "generic" drug, without regard to the actual manufacturer. Thus, one manufacturer's DES was equally as likely to have produced the injury as any other manufacturer's DES. In other words, each DES manufacturer's product posed *the same risk of harm* to users.

Unlike DES, Factor VIII is not a generic, fungible drug. Each processor prepares its Factor VIII concentrate by its own proprietary processes using plasma collected from its own sources. Each firm's Factor VIII concentrate is clearly distinguishable by brand name, package color, lot number, and number of units of Factor VIII per vial; each firm's Factor VIII concentrate is separately licensed by the Food and Drug Administration. There is no evidence that all Factor VIII products caused or were equally capable of causing HIV infection. Thus, *the risk posed by the different brands of Factor VIII is not identical.*

The majority here admits that Factor VIII is not fungible, that is, it does not pose the same risk of harm to users because, as the majority states, "[t]he reason is obvious — the donor source of the plasma *is not constant.* Therefore, Factor VIII is only harmful if

the donor was infected; DES is *inherently* harmful." (Emphasis added.) However, having conceded that Factor VIII is not fungible, the majority disregards the fungibility requirement, which under *Sindell* renders market–share inapplicable.

The *Sindell* court reasoned that imposing liability based on market share was justified because *every* DES pill could potentially cause harm to the entire general population of users. In other words, every DES pill, which contained a component common to all DES pills, posed the same risk to consumers. In contrast, no two manufacturers' Factor VIII concentrates were equally capable of causing HIV infection, and in fact, most vials were not harmful at all. By eliminating the fungibility requirement, as the majority does, the whole concept of market–share liability is destroyed.

## B. Inability to Identify Specific Producers

The second prerequisite of applying market–share liability is that the product "cannot be traced to any specific producer." *Sindell*, 26 Cal. 3d at 610, 607 P.2d at 936, 163 Cal. Rptr. at 144. The *Sindell* court noted that the circumstances of plaintiff's injury appeared to render identification of the manufacturer of the drug ingested by her mother impossible due to the time lapse between ingestion and manifestation of plaintiff's injury. The court stated, "[c]ertainly there can be no implication that plaintiff is at fault in failing to [identify the specific manufacturer] — the event occurred while plaintiff was *in utero*, a generation ago." *Sindell*, 26 Cal. 3d at 600–01, 607 P.2d at 930, 163 Cal. Rptr. at 138 (footnote omitted). Here, the majority dilutes the second prerequisite by merely requiring a showing that "it is *difficult* for the consumer to identify the source of the product . . . ." (Emphasis added.) Difficulty in identifying a wrongdoer is clearly an insufficient and unreasonable basis to distort Hawaii's tort law and adopt the market–share liability theory.

Unlike the DES situation, this is not a case where product identification, and thus proof of causation, is impossible because a generation has lapsed between exposure and injury. By the time the harm caused by DES manifested itself, generally no prescription records were available. Here, however, the period of time from plaintiff's claimed exposure to the HIV virus, between 1983 and 1984, to the time he tested positive for HIV antibodies in 1986, was no more than two to three years. Also, unlike the DES plaintiffs who were *in utero* and could not identify the source of DES used by their mothers, plaintiff here could have identified the Factor VIII he used. Unfortunately, through no fault of the defendant processors, plaintiff failed to observe and record the name and lot numbers of the Factor VIII he used and the dates he used them.

As noted by defendant Armour Pharmaceutical Company (Armour) in its answering brief,

> most hospitals and pharmacies maintain records of therapeutic materials purchased and dispensed. The fact that the particular pharmacy where Smith received his Factor VIII did not keep such records long enough or in a form appropriate to meet Smith's litigation requirements is not an inherent circumstance of all AIDS cases involving hemophiliacs which would justify a new rule of law.
>
> Smith lived at home with his parents until September 1985, as did his brother, former plaintiff "James Jones."[2] It was entirely undisputed that plaintiff Smith used the same Factor VIII concentrate as did his brother, and they kept their shared supply in the refrigerator at home. While plaintiff Smith's own medical records were claimed to be missing, the medical records of Smith's brother, with whom Smith had shared the same supply of

---

[2] The answering brief of defendant Baxter Healthcare Corporation explains that "[t]his action is one of four related cases filed in the United States District

> Factor VIII concentrate, *are* available and do *not* mention Armour or reflect any use of Armour concentrate during any of the years 1982, 1983, 1984 or 1985. Smith's mother likewise did not recall Armour's concentrate as one which she had ever seen in the refrigerator used to keep her sons' supplies.

(Emphasis in original, citations omitted.) Under these facts, James Jones may not have been able to recover from Armour because records were kept in his case. However, in Smith's case, the majority's market–share liability theory would shift the burden and litigation cost to defendant Armour, and Armour would be required to exculpate itself merely because it had a market share of Factor VIII concentrates. If unsuccessful, defendant Armour would be required to pay or contribute to payment for injuries, which its product may not have caused, simply because it could not prove the negative. The difficulty in identifying the wrongdoer here is individual to plaintiff's own case and should not be used as a reason to justify applying a new rule of law in this jurisdiction.

Based on the foregoing discussion, I submit that the majority's reliance on DES cases to support its decision to adopt the market–share theory of liability is misplaced.

---

Court of Hawaii. The first, *John Doe v. Cutter Biological, et. al.* (No. 87–0232), was instituted as a class action suit on behalf of all hemophiliacs in Hawaii (including Smith). However, class certification was denied on December 8, 1977 by Judge Fong. Doe and the other plaintiffs therefore proceeded with individual actions against the same defendants, under the pseudonyms 'Richard Roe' (No. 87–0893–HMF), 'James Jones' (No. 87–892–ACK), and his brother, the appellant in this action, 'John Smith' (No. 87–0891–ACK). All alleged negligence by the defendant processors and by treating physicians at Tripler Army Medical Center. Both *Jones* and *Roe* have since been dismissed with no appeal. The *Doe* action presently remains pending before the Ninth Circuit Court of Appeals (No. 89–15274), on appeal of the District Court's Order which granted summary judgment to defendants." (Footnote omitted.)

## III. Standard of Care

The majority's caveat that "we recognize that our opinion is limited to the facts presented to us," is ironic because the facts before us do not allow for the application of a market–share theory. The market–share theory of liability eliminates the element of causation but still requires plaintiff to prove the first two elements fundamental to a negligence cause of action — the existence of a legal duty and breach of that duty.

The majority states, "[a]s we see that the lack of screening of donors and failure to warn are the breaches alleged, appellant's argument for not using DES theories (because Factor VIII is not fungible) is not convincing." The reference to plaintiff's allegations of defendants' breach of duty in screening donors and failure to warn infers that proof at trial may be forthcoming to show that each defendant herein equally breached a duty of care. That proof would then somehow establish that all Factor VIII concentrates manufactured subsequent to the breach posed the same risk of harm to all users. With the techniques now available to screen donors and identify infected plasma, this proposition may presumably have merit. However, the fact that Smith has not shown when or even how he became infected precludes him from being able to establish any breach of duty based on a provable standard of care.

Smith was diagnosed as a hemophiliac in 1964 and began using Factor VIII concentrates in 1972 from unidentified sources. He moved to Hawaii in late 1982 and received Factor VIII concentrates from Tripler Hospital between 1982 and 1985. For the first time in 1986, Smith's blood was tested for the HIV virus. The test was positive. Smith claims that his exposure to the virus occurred in 1983 or 1984. However, there is no evidence that Smith did not contract the HIV virus from other activities or sources, including blood products manufactured by companies other than the defendants. As noted by the majority (citations omitted):

> AIDS is an infectious disease caused by a virus . . . [which] . . . was uniquely recognized in June and July, 1981. There are several modes of infection: 1. sexual intercourse, 2. sharing infected syringes, 3. receipt of human tissue, blood, etc., and 4. childbirth or breast feeding. Once infected, a victim will not test positive for HIV during a "window" period, which lasts between six weeks and six months — although some researchers say the window period may be several years. Although testing positive, a person may continue to be asymptomatic for seven to ten years.

Moreover, the majority acknowledges that only in 1982 was there an understanding that AIDS might possibly be transmitted via blood products; and also that "[t]he concensus that AIDS was blood transmissible finally came in 1984;" but that scientists did not develop serologic testing to detect antibodies until 1985.

The evidence shows that Smith, who began using Factor VIII in 1972, may have received infected Factor VIII concentrates before the possibility of HIV transmission through blood products was ever known. Moreover, having tested positive in 1986 in no way demonstrates that Smith was infected with the HIV virus only after coming to Hawaii. The nature and history of AIDS indicates that Smith was as likely to have contracted the virus months or even years before coming to Hawaii.

The majority cites a Florida United States District Court case that approved the application of the market–share liability theory in a Factor VIII case at the summary judgment stage. In *Ray v. Cutter Laboratories*, 754 F. Supp. 193 (M.D. Fla. 1991), the court relied upon *Conley v. Boyle Drug Co.*, 570 So. 2d 275 (Fla. 1990), a Florida Supreme Court decision, which had adopted the market–share liability theory in a DES case. However, the district court's premise for applying market–share liability in *Ray* is faulty because it distorts the fungibility requirement and fails to recog-

nize that plaintiffs would not have been able to establish a standard of care.

In *Ray*, the court noted that DES met the prerequisite of market–share liability by creating the same risk of harm to all users because it was produced using the same formula. The court then acknowledged that Factor VIII may differ from one batch to the next, depending on the pool of plasma donors. However, it then erroneously concluded that "while one Factor VIII product may have been infected with the AIDS virus while another may not have been, the *risk* that infection was present was the same from product to product *during the period of time prior to initiation of screening for donors at risk of having AIDS*." 754 F. Supp. at 196 (emphasis added). The *Ray* court goes on to state:

> At the time the Ray boys allege they were infected, not only did no test for AIDS exist, the AIDS virus itself had not even been identified. Thus, it will never be possible for the Plaintiffs to identify which particular batch or batches of Factor VIII caused their respective AIDS infections."

*Id.*

The obvious problem in the *Ray* court's analysis is that 1) Factor VIII concentrates do not pose the same risk if one product is infected and another is not, and 2) it calls for absolute liability, unlike market–share liability, which still requires a showing of the existence of a duty of care and a breach of that duty. No standard of care existed when the *Ray* plaintiffs allege they were infected. Thus, there could be no showing of a breach of duty.

Similarly in this case, Smith is unable to prove when or even how he was infected with the HIV virus. That inability, coupled with the fact that information regarding AIDS and its relationship to Factor VIII use was just being developed in the early 1980's, leaves to pure speculation what applicable standards, if any, should

have been imposed on defendants regarding the duty to screen donors or to warn users of its Factor VIII concentrates. Thus, under the facts of this case, plaintiff cannot establish a standard of care, and consequently, there can be no showing of a breach of duty.

## IV. Judicial Restraint

The majority's primary reason for adopting the market–share liability theory, in a form that is even more expansive than in *Sindell*, is that "the harshness of the result, that is, burdening the innocent plaintiff without a remedy, to us seems totally unfair and out of step with current efforts to allow recovery when the proper case is brought."

I, too, sympathize with Smith's tragic situation. However, this court has been faced with similar situations and has applied judicial restraint by declining to expand established principles of the common law merely to provide a remedial measure. Recently, in *Winters v. Silver Fox Bar*, 71 Haw. 524, 797 P.2d 51 (1990), we were presented with a certified question from the United States District Court for the District of Hawaii that gave us an opportunity to expand our dram shop law to allow a wrongful death cause of action for the family of a deceased minor. In declining to expand our dram shop law we stated that the question of

> whether some remedial measure can be found in further modifying the common law by shifting the burden and responsibility of injuries to minors resulting from their voluntary consumption of alcohol to the commercial seller of liquor is best left to the wisdom of the Legislature and its process.
>
> It is within the legislature's province to weigh and balance the far reaching social, economic and legal

consequences of modifying the common law as Appellant urges.

*Id.* at 535, 797 P.2d at 56.

I submit that this court is again confronted with an issue which it is ill–equipped to rule upon. There are too many unanswered questions of social, economic, and legal import, which only the legislature, with its investigative powers and procedures, can determine. Deference to the legislature is especially appropriate due to the legislature's enactment of the blood shield statute and the impact that any nonidentification theory such as market share may have on the blood products industry.

Furthermore, I disagree with the majority's statement that Hawaii would be "out of step with current efforts to allow recovery when the proper case is brought." As defendant Cutter Biological notes in its answering brief, since the initial adoption of market–share liability in *Sindell*, the highest courts of only four other states have adopted that theory. *Conley v. Boyle Drug Co.*, 570 So. 2d 275 (Fla. 1990) (DES case); *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944, 110 S. Ct. 350 (1989) (DES case); *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37, *cert. denied*, 469 U.S. 826, 105 S. Ct. 107 (1984) (DES case); *Martin v. Abbott Laboratories*, 102 Wash. 2d 581, 689 P.2d 368 (1984) (DES case). In no state was that theory applied in the face of a contrary statute similar to Hawaii's blood shield law.

Four state supreme courts have rejected the market–share theory of liability doctrine: *Smith v. Eli Lilly & Co.*, 137 Ill. 2d 222, 560 N.E.2d 324 (1990) (DES case); *Shackil v. Lederle Laboratories*, 116 N.J. 155, 561 A.2d 511 (1989) (DPT vaccine case); *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67 (Iowa 1986) (DES case); and *Zafft v. Eli Lilly & Co.*, 676 S.W.2d 241 (Mo. 1984) (DES case).

A number of federal courts have also rejected the doctrine: *Tidler v. Eli Lilly & Co.*, 851 F.2d 418 (D.C. Cir. 1988) (DES case); *Morton v. Abbott Laboratories*, 538 F. Supp. 593 (M.D. Fla. 1982) (DES case); *Mizell v. Eli Lilly & Co.*, 526 F. Supp. 589 (D.S.C. 1981) (DES case); *Ryan v. Eli Lilly & Co.*, 514 F. Supp. 1004 (D.S.C. 1981) (DES case). An empirical study of this issue concluded that "[i]n the last several years decisions in a number of jurisdictions *clearly* indicate that courts are in no mood to extend that expansionary doctrine [market–share liability] any further." Henderson & Eisenberg, *The Quiet Revolution in Products Liability: An Empirical Study of Legal Change*, 37 U.C.L.A. L. REV. 479, 492 (1990) (emphasis added).

The Iowa Supreme Court in *Mulcahy v. Eli Lilly & Co.*, 386 N.W.2d 67 (Iowa 1986), aptly states some of the basic reasons why nonidentification theories, which eliminate causation as an element of plaintiff's proof, should not be adopted by the courts:

> We acknowledge that plaintiff in a DES case with an unidentified product manufacturer presents an appealing claim for relief. Endeavoring to provide relief, courts have developed theories which in one way or another provided plaintiffs recovery of loss by a kind of court–constructed insurance plan. The result is that manufacturers are required to pay or contribute to payment for injuries which their product may not have caused.
>
> This may or may not be a desirable result. We believe, however, that awarding damages to an admitted innocent party by means of a court–constructed device that places liability on manufacturers who were not proved to have caused the injury involves social engineering more appropriately within the legislative domain. In order to reach such a determination, three broad policy questions must be answered. One is whether the burden

of damages for these injuries should be transferred in a constitutional manner to the industry irrespective of an individual manufacturer's connection with the particular injury. If so, the second question relates to the principles and procedures by which the burden would be transferred. Finally, how do we ascertain the extent of damages to be assessed against each manufacturer? . . .

Plaintiffs request that we make a substantial departure from our fundamental negligence requirement of proving causation, without previous warning or guidelines. The imposition of liability upon a manufacturer for harm that it may not have caused is the very legal legerdemain, at least by our long held traditional standards, that we believe the courts should avoid unless prior warnings remain unheeded. It is an act more closely identified as a function assigned to the legislature under its power to enact laws.

*Id.* at 75–77.

## V. Conclusion

Leaving plaintiff without a remedy is a harsh result. However, this is not the proper case upon which this court should innovate and radically change the existing law. The application of market–share liability in the context of this case would essentially make each defendant manufacturer an insurer of any infected individual who "might" or "could" have used its Factor VIII concentrate. Not only would such an approach directly contravene Hawaii's blood shield statute and the public policy which prompted its enactment, but such a broad imposition of liability is wholly unjustified, unfair, and likely to discourage the future development and sale of blood therapies. The decision of whether such an expansive theory

of liability should apply as against manufacturers of blood products is best left to the legislature, which is equipped to address the "Pandora's box" of questions that the majority acknowledges results by today's decision.

I submit that the majority is mistaken if its characterization of the record as a "virtual factual vacuum" means that the facts are insufficient, and thus a trial is necessary to develop additional facts in this case. Additional facts will not change the inevitable — that is, Smith's inability to establish when and how he was infected by the HIV virus, and the fact that information regarding AIDS and the techniques to detect the HIV virus were just being developed during the pertinent period, make it impossible for Smith to prove a standard of care. The majority's decision now allows all of the parties to proceed to trial, which undoubtedly will result in substantial costs and attorneys' fees being incurred. However, the expenditure of time and money will be for naught.

For these reasons, I would answer the certified questions as follows:

1. Hawaii's blood shield law, HRS § 327–51, precludes Smith [plaintiff] from bringing a strict liability claim.

2. Hawaii's blood shield law does not preclude Smith from bringing a negligence claim as to any defendant against whom Smith is able to establish 1) a duty owed to him; 2) breach of that duty; 3) causation; and 4) injury. The statute requires Smith to prove that his HIV infection was caused by one of the defendant's own negligence.

3. Hawaii does not recognize the applicability of any nonidentification theory of causation to this case. The circumstances of this action do not provide a sufficient or appropriate basis to depart from the

well–established principles of negligence liability under Hawaii law.